In re GENERAL MOTORS CLASS H SHAREHOLDERS LITIGATION.

Civil Action No. 15517.

Court of Chancery of Delaware, New Castle County.

Submitted: March 17, 1999.
Decided: March 22, 1999.

Joseph A. Rosenthal, Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware, Pamela S. Tikellis, Robert J. Kriner, Jr., of Chimicles & Tikellis LLP, Wilmington, Delaware; Neil L. Selinger, William R. Weinstein, of Lowey Dannenberg Bemporad & Selinger, White Plains, New York, Lawrence Sucharow, Jonathan M. Plasse, of Goodkind, Labaton, Rudoff & Sucharow, New York City, David J. Bershad, Steven G. Shulman, Joshua H. Vinik, Kim E. Miller, of Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Vincent R. Cappucci, of Bernstein Litowitz Berger & Grossman LLP, New York City, of counsel for Plaintiffs.

R. Franklin Balotti, Lisa A. Schmidt, of Richards, Layton & Finger, Wilmington, Delaware; Michael J. Basford, of General Motors Corporation, Detroit, Michigan, Robert J. Kopecky, Alex Dimitrief, of Kirkland & Ellis, Chicago, Illinois, of counsel for General Motors Corporation.

Grover C. Brown, Joseph C. Schoell, of Morris, James, Hitchens & Williams, Wilmington, Delaware; Dennis J. Block, Stephen A. Radin, of Weil, Gotshal & Manges LLP, New York City, of counsel, for Individual Defendants.

## OPINION

STRINE, Vice Chancellor.

This action challenges the fairness of transactions (the "Hughes Transactions") that split up General Motors Corporation's wholly owned Hughes Electronic Corporation ("Hughes Electronic") subsidiary. The plaintiffs purportedly bring this action on behalf of themselves and other holders of the Class H Common Stock ("GMH shares or stock") of General Motors ("GM"). GMH stock derived much of its value from the performance of Hughes Electronic.

Plaintiffs contend that in connection with the Hughes Transactions: 1) GM breached the rights of GMH stockholders under the GM certificate of incorporation; 2) GM's board of directors (the "Board") breached the fiduciary duties of care and loyalty they owed to GMH stockholders; and 3) GM's Board breached the duty of

disclosure they owed to GMH stockholders. The defendants have moved to dismiss the complaint under Chancery Court Rule 12(b)(6).

In this Opinion, I dismiss the plaintiffs' claim that the GMH stockholder vote, by which approval of the Hughes Transactions was obtained, was tainted by coercion and misdisclosures. Since the GMH stockholders approved the Hughes Transactions in a fair vote and there is no allegation that the Hughes Transactions were wasteful, I also dismiss the plaintiffs' remaining claims.

## I.

### A. *The Defendants*

Defendant GM is a rather well-known Delaware corporation. Aside from being the world's "largest full-line vehicle manufacturer," Compl. ¶ 18, and a provider of financial services, GM was also, as of 1997, the sole owner of Hughes Electronics. At that time, Hughes Electronics consisted of: Hughes Defense, a defense and aerospace company; Hughes Telecom, a space and telecommunications business; and Delco Electronics Co. ("Delco"), a manufacturer of electronic systems and parts. Compl. ¶ 2. Hughes Defense and Hughes Telecom functioned as parts of a business collectively known as Hughes Aircraft Company.

As of October 20, 1997, GM had approximately 101,446,000 shares of GMH stock and 756,035,101 shares of GM $1 ⅔ common stock outstanding. GM $1 ⅔ and GMH common shares are independently listed on the New York Stock Exchange.

The other defendants are members of the GM Board. Of the fifteen director defendants, only two are employees and/or officers of GM. Compl. ¶¶ 19–33. According to the complaint, each of the director defendants owns more GM $1 ⅔ stock, both in terms of numbers of shares and dollar values of shares, than GMH stock. *Id.*

### B. *The Unique Characteristics of GMH Shares*

Although GMH shares were common stock of GM, those shares had special characteristics derived from the relationship of those shares to GM's Hughes Electronics subsidiary; hence, the name "H" shares.

Holders of GMH shares had no direct rights in the equity or assets of Hughes Electronics, but rather had those rights in the equity and assets of GM, Hughes Electronics' sole owner. Compl. ¶ 40. The dividend right of GMH shares, however, was tied exclusively to the financial performance of Hughes Electronics. *Id.* Pursuant to the GM certificate, GMH dividends were paid on a "tracking stock" basis based upon the paid-in surplus of GM attributable to GMH shares and an allocated portion (approximately 25%) of the earnings of Hughes Electronics. *Id.*, ¶ 2.

As a result, GMH stockholders had a vital economic interest in Hughes Electronics. Thus, a series of transactions—like the Hughes Transactions—which transformed that GM subsidiary had the potential to markedly benefit or impair the value of the shares they held.

With that in mind, I now describe the Hughes Transactions.

### C. *The Hughes Transactions*

As adverted to previously, before the Hughes Transactions, Hughes Electronics consisted of: Hughes Defense and Hughes Telecom, collectively known as Hughes Aircraft; and Delco: a manufacturer of electronic automobile systems and parts. *Id.*, ¶ 2. The Hughes Transactions involved the following:

- A spin off of Hughes Defense to GM $1 ⅔ common stock and GMH shareholders.
- A subsequent merger of Hughes Defense with Raytheon Corp., leaving the GMH and GM $1 ⅔ stockholders as owners of $5.2 billion worth of newly issued Class A Raytheon

shares. Approximately 58.7% of the Raytheon shares went to GMH holders and 41.3% went to GM $1 ⅔ holders.

- The GMH and GM $1 ⅔ stockholders received 100% of the Raytheon Class A shares, constituting 30% of the total equity of Raytheon. However, the voting rights of the Class A comprise 80% of the voting power in Raytheon board of director elections.
- In the merger, Raytheon assumed responsibility for $4.3 billion worth of Hughes Defense debt.
- A transfer of Delco to GM, after which Delco became a part of GM's Delphi Automotive Systems business.
- A net infusion of $1.0 billion to Hughes Telecom for investment in its business, as a result of certain financing arrangements between GM and Raytheon.
- A recapitalization of the GMH stock into a new GMH common stock linked to the performance of Hughes Telecom, but not Delco.

*Id.,* ¶ 3–6, 49, 52.

The end result is that GMH shareholders ended up with: (i) a large economic interest as direct stockholders in Raytheon, the purchaser of Hughes Defense; (ii) a "tracking interest" in Hughes Telecom as holder of the recapitalized GMH shares; and (iii) a more tenuous economic interest in Delco, now a division of GM.

### D. *Stockholder Waiver of the Recapitalization Charter Provision*

The Hughes Transactions were contingent upon approval of both the GMH and GM $1 ⅔ stockholders, voting separately. GM obtained such approval via stockholder solicitation. The solicitation statement ("Solicitation") used for this purpose was mailed to the stockholders in November 1997. On December 17, 1997, GM obtained the stockholder consents necessary to consummate the Hughes Transactions.

As part of the consent process, GM asked the GMH and GM $1 ⅔ stockholders to approve a merger agreement between GM and a subsidiary, which provided for certain amendments to GM's certificate of incorporation. One of those amendments deleted a provision of that certificate which gave the GMH stockholders the right to receive GM $1 ⅔ stock worth 120% of the market value of their GMH stock (the "Recap Provision") under the following circumstances:

> In the event of the sale, transfer, assignment or other disposition by the Corporation [1] *of substantially all of the business of Hughes Aircraft Company, its subsidiaries and successors* or [2] of substantially all of the other business of Hughes to a person, entity or group of which the Corporation is not a majority owner (whether by merger, consolidation, sale of assets or stock, liquidation, dissolution, winding up or otherwise), effective upon the consummation of such sale, transfer, assignment or other disposition ... the Corporation shall be recapitalized and all outstanding shares of [GM] Class H Common Stock shall be exchanged for fully paid and nonassessable shares of [GM $1 2/3] Common Stock at the Exchange Rate.

GM Cert., Article FOURTH, Div. I, § (c)(3). The merger agreement waived any applicability of the Recap Provision to the Hughes Transactions. Sol., App. A at A–6.

The Solicitation informed the GMH holders that their vote to approve the Hughes Transactions had the effect of waiving any possible application of the Recap Provision:

> As part of the Hughes Transactions, the GM Certificate of Incorporation will be amended to eliminate any possible application of the recapitalization provision to the Hughes Transactions ... By voting in favor of the Hughes Transactions, you will in effect be waiving any application

of the provision to the Hughes Transactions.

Sol. at 7.

## II. *Legal Analysis*

 In considering a Rule 12(b)(6) motion, this court must assume the truth of well-pleaded allegations, giving the plaintiff the benefit of all reasonable inferences that can be drawn from the complaint. *Grimes v. Donald*, Del.Supr., 673 A.2d 1207, 1213–1214 (1996). However, "[c]onclusory statements without supporting factual averments will not be accepted as true for purposes of a motion to dismiss." *Id.* at 1214.

The complaint consists of three counts: breach of contract (Count I); breach of the fiduciary duties of care and loyalty (Count II); and breach of the fiduciary duty of disclosure (Count III).

The last count has particular significance. It alleges that the GM Board violated its fiduciary duty of disclosure by procuring the approval of the Hughes Transactions through a materially false and misleading Solicitation. Because of these alleged disclosure violations and because the GM board's decision gave the GMH stockholders the opportunity to obtain the benefits of the Hughes Transactions only upon the allegedly "coercive" condition that they waive the Recap Provision, plaintiffs contend that the GMH stockholder vote was a nullity. Therefore, plaintiffs conclude, the vote was ineffective to deprive GMH stockholders of their rights under the Recap Provision, and to insulate GM and its directors from liability for breaches of their contractual and fiduciary duties in connection with the Hughes Transactions.

To a large extent, the disposition of this motion therefore turns on whether plaintiffs have stated a claim that the GMH stockholder approval of the Hughes Transactions was tainted by either improper coercion or false and misleading disclosures. If not, then all three counts of plaintiffs' complaint are susceptible to dismissal.

In Section II, C. of this Opinion, *infra,* I conclude that the plaintiffs have failed to state a claim that the stockholder vote was tainted in either respect and therefore that plaintiffs' duty of disclosure claim must be dismissed. As a result, in addressing the plaintiffs' contract and fiduciary duty claims, I first determine what effect a free and informed stockholder vote has on the viability of those claims.

## A. *Count I: Breach of Contract*

 Plaintiffs claim that GM breached the contractual rights of GMH stockholders under the Recap Provision by structuring the Hughes Transactions so as to deprive them of their (to use plaintiffs' words) "right" to a "20% premium." In this regard, plaintiffs claim that the merger of Hughes Defense into Raytheon constituted a "sale ... by [GM] of substantially all of the business of Hughes Aircraft" and thereby invoked the GMH stockholders' rights under the Recap Provision.

The contractual rights vested in corporate stockholders by a certificate of incorporation are subject to amendment by vote of those stockholders or by merger. 8 *Del.C.* § 242(b)(2) (amendments to a certificate of incorporation to alter or change the preferences or special rights of a class of stock may be made with the approval of a majority of the outstanding shares of that class or such greater vote as the certificate requires); GM Cert., Art. FOURTH, Div. I., § (b)(ii) (GMH holders "shall be entitled to approve by the vote of a majority of the shares of Class H ... then outstanding any ... repeal of ... provisions of this Certificate ... which adversely affects the rights, powers or privileges of the Class H"); 8 *Del.C.* § 251(e) (upon merger of two corporations, "the certificate of incorporation of the surviving corporation shall automatically be amended to the extent, if any, that changes in the certificate of incorporation are set forth in the agreement of merger");

*Rothschild Int'l Corp. v. Liggett Group, Inc.*, Del.Supr., 474 A.2d 133, 136–137 (1984) ("where a merger of corporations is permitted by law, a shareholder's preferential rights are subject to defeasance"). The GMH stockholders were "charged with knowledge of this possibility at the time they acquire[d] their shares." *Rothschild,* 474 A.2d at 137.

Because the GMH stockholders consented to the inapplicability and repeal of the Recap Provision in a vote that was not tainted by improper coercion or false and misleading disclosures, their consent was effective to waive any contractual rights they possessed under that Provision. As a result, Count I is dismissed.[1]

### B. *Count II: Breach of Fiduciary Duty*

Stated simply, Count II alleges that the GM directors breached their fiduciary duties of care and loyalty by: using an unfair process to establish the terms of the Hughes Transactions and to apportion the consideration between the GMH and GM $1 ⅔ stockholders; failing to inform themselves about the value of and rights attached to the GMH stock; coercing the GMH stockholders to vote for the Hughes Transactions; and attempting in bad faith to deprive the GMH stockholders of their right to a premium under the Recap Provision. Compl. ¶¶ 91–96.

Count II of the Amended Complaint will be dismissed for three independent reasons.

#### 1. *The Stockholder Vote Invokes The Business Judgment Standard of Review*

■ Having determined that the complaint fails to state a claim that the stockholder vote was uninformed or coerced, I believe that the stockholder vote bars Count II.

In this case, the stockholder class directly affected by the substantive board decisions complained of in Count II—the Hughes Transactions and the Board's decision not to trigger the Recap Provision—was given the power to approve or disapprove those decisions. Because the shareholders were afforded the opportunity to decide for themselves on accurate disclosures and in a non-coercive atmosphere, the business judgment rule applies, and the plaintiffs must, to avoid dismissal, plead that the Hughes Transactions were wasteful. *In re Wheelabrator Technologies, Inc. Shareholders Litig.,* Del.Ch., 663 A.2d 1194, 1202 (1995) (where transaction is approved after an untainted vote and where no controlling stockholder had *de jure* or *de facto* control over the vote, the applicable standard of review was business judgment); *see also Marciano v. Nakash,* Del.Supr., 535 A.2d 400, 405 n. 3 (1987) ("approval by fully informed ... disinterested stockholders ... permits invocation of the business judgment rule and limits judicial review to issues of gift or waste with the burden of proof upon the party attacking the transaction"); *Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1387 n. 38 (1996) (dissenting opinion) ("If the Charter Amendment had been put to a separate vote of the minority shareholders they would have had an operative choice and, presumably, an affirmative vote would have relieved the Board of its burden of defending the Plan."); *see also In re Santa Fe Pac. Corp. Shareholder Litig.,* Del. Supr., 669 A.2d 59, 68 n. 5 (1995). ("In most circumstances, where a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified transaction normally must fail."). In view of the evident rational business purpose for the Hughes Transactions and the lack of any waste claim, dismissal of plaintiffs' fiduciary duty claim is required.[2]

---

1. Given that I have found that the GM board did not misinform or coerce the GMH stockholders into voting to waive the Recap Provision, there is also no merit to plaintiffs' claim that GM's decision to condition the Hughes Transactions on that waiver somehow constituted a breach of the GM certificate's implied covenant of good faith and fair dealing.

2. In this regard, those aspects of Count II which claim that the board breached its fidu-

In so ruling, I note that this is not a case in which the defendants are attempting to use the stockholder vote to insulate themselves from responsibility for decisions not directly at issue in the vote. *See, e.g., Santa Fe,* 669 A.2d at 68 (court would examine *Revlon* and *Unocal* claims and not give ratification effect to stockholder vote where the stockholders "merely voted in favor of the merger and not the defensive measures"). Nor does the structure of GM's ownership interest in Hughes give rise to concerns about "implied coercion" such as has been found to exist where a controlling stockholder dominates the corporation. *See Citron v. E.I. DuPont de Nemours & Co.,* Del.Ch., 584 A.2d 490, 501–502 (1990); *see also Kahn v. Lynch Communication Systems, Inc.,* Del.Supr., 638 A.2d 1110, 1116 (1994). For example, in a situation involving an "interested cash-out merger" *and* a controlling stockholder, the effect of stockholder ratification is limited to shifting the burden of proof under the entire fairness standard from the defendants to the plaintiffs. *Kahn,* 638 A.2d at 1117. This is not such a situation. The disapproval of the Hughes Transactions would not have displeased a controlling stockholder, from whom the GMH stockholders might reasonably fear retaliation. *Wheelabrator,* 663 A.2d at 1204 (where merger "did not involve an interested and controlling stockholder" ratification invoked business judgment review).[3]

## 2. Plaintiff Has Failed to Plead Facts Undermining the Board's Independence

■ Count II must also be dismissed because plaintiffs' challenge to the independence of the members of GM's Board is too weak to state a claim that the business judgment rule does not apply to the Board's approval of the Hughes Transactions. As to self-interest, all the plaintiffs have pled is that the GM directors own substantially more GM $1 ⅔ shares than GMH shares.[4] To show that a GM director's independence was compromised by her ownership of greater amounts of GM $1 ⅔ stock, the plaintiffs must plead that the amount of such holdings and the predominance of such holdings over GMH holdings was of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the GMH shareholders without being influenced by her overriding personal interest in the performance of the GM $1 ⅔ shares. *See In re Walt Disney Co. Derivative Litig.,* Del. Ch., C.A. No. 15452, 1998 WL 731587, at *10, Chandler, C. (Oct. 7, 1998) (where consulting fees were not shown to be material to independent director based on his actual circumstances, plaintiff's attack on the director's independence failed); *see generally Cede & Co. v. Technicolor, Inc.* ("*Cede II*"), Del.Supr., 634 A.2d 345, 363–

---

ciary duties by failing to provide structural protections for the GMH stockholders because of the potential divergence between the interests of GMH and GM $1 ⅔ stockholders seem especially deficient. Where a board of directors offers a group of stockholders the ultimate procedural protection—the right to affirm or veto the decision at the corporate ballot box—and where that vote is untainted by misleading disclosures or improper coercion, I do not believe that plaintiffs can state a claim that the failure to employ lesser protections, such as a special committee mechanism, constitutes, in and of itself, a breach of fiduciary duty.

**3.** The complaint is silent as to whether the named plaintiffs consented to the Hughes

Transactions. To the extent that they did, a case decided by Delaware's Supreme Court suggests that they cannot now mount a challenge to those Transactions even on the grounds that the Transactions were wasteful. *Bershad v. Curtiss–Wright Corp.,* Del.Supr., 535 A.2d 840, 848 (1987) ("when an informed minority shareholder either votes in favor of the merger ... or accepts the benefits of the transaction, he or she cannot thereafter attack its fairness").

**4.** As to the management directors, the only additional fact pled is that those two directors (who constituted only two members of GM's fifteen person Board) are managers of GM, a fact that is of little, if no, importance in the context of this case.

364 (1993) (subsequent history omitted) (to rebut presumption of business judgment rule, plaintiff must proffer evidence that members of the board had a material self-interest suggesting disloyalty); *Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156, 1167–1169 (1995) (subsequent history omitted) (same).

The complaint is devoid of any alleged facts supporting the materiality of the GM $1 ⅔ holdings to the directors and is thus inadequate. The mere fact that the GM directors own more GM $1 ⅔ shares is wholly unsurprising given that there are seven times more of those shares on the market than there are of GMH shares. Comp. ¶ 18(b). According to the complaint, the GM directors actually own a greater proportion of the outstanding GMH shares than they do of the outstanding GM $1 ⅔ shares. Compl. ¶¶ 19–33 (directors own .9% of outstanding GMH shares and only .4% of outstanding GM $1 ⅔ shares). Furthermore, the weakness of this showing of self-interest is heightened by the fact that the potentially divergent interests of the GMH and GM $1 ⅔ shareholders in the context of the Hughes Transactions was heavily balanced by their shared interest in obtaining the highest possible price from Raytheon. In sum, there are no facts alleged in the complaint which, if true, could support an inference that the GM directors' holdings of GM $1 ⅔ stock were so substantial as to have rendered it improbable that those directors could discharge their fiduciary obligations in an even-handed manner. *See Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1147–1148 (1990) (fact that board members had interests as non-tendering stockholders which were in conflict with company shareholders who tendered did not vitiate business judgment rule protection since the conflict between these stockholder groups was "unavoidable" and "in attempting to fulfill their duties to the

shareholders, directors may have to make difficult decisions involving . . . competing shareholder groups"); *see also Jedwab v. MGM Grand Hotels, Inc.*, Del.Ch., 509 A.2d 584, 595 (1986) (where there was no reason to believe that controlling stockholder had a self-interest, as a result of his holdings of two classes of shares, to favor one class over the other, attack on applicability of business judgment rule on that basis failed); *Freedman v. Restaurant Assocs. Indus.*, Del.Ch., C.A. No. 9212, mem. op. at 27–28, Allen, C., 1987 WL 14323 *10 (Oct. 16, 1987) (expressing the view that the mere fact that directors own more of one class of stock than another does not deprive them of the benefits of the business judgment rule in a situation where the directors are required to apportion consideration between the two classes of stock).

■ At essence, therefore, the plaintiffs' duty of loyalty claim hinges on the following. In structuring the Hughes Transactions, the GM Board had the duty to balance fairly the interests of two groups of stockholders to whom they owed fiduciary duties. Since the two stockholder groups had potentially divergent interests, plaintiffs believe that they state a duty of loyalty claim merely by alleging that the Board treated one group unfairly—even if it was for reasons unrelated to director self-interest. In my view, that is not the law. Rather, the plaintiffs must plead facts from which one could infer disloyalty or bad faith on the part of GM's directors, in the sense that the directors acted for reasons inimical to their fiduciary responsibilities. An allegation that properly motivated directors, for no improper personal reason, advantaged one class of stockholders over the other in apportioning transactional consideration does not state a claim for breach of the duty of loyalty.[5] *Gilbert*, 575 A.2d at

---

5. If the law is to protect a stockholder claiming injury in a transaction involving solely such a structural conflict and involving no improper self-dealing by the fiduciaries, it

should do so on a more logical and straightforward theory than that the fiduciaries were "interested" in the transaction and that therefore the fiduciaries are subject to personal

1147–1148.[6] In this regard, the fact that the GMH common stockholders had "tracking" interests in Hughes does not distinguish this case from those in which boards had to balance the interests of different classes of common and/or preferred stockholders. Although the particular features of the classes of stock involved in an individual case may have significance, the general fiduciary principles are the same.

Plaintiffs could (absent the stockholder vote) theoretically state a duty of care claim by alleging, as they have, that the Board was grossly negligent in considering the respective values of the GMH and GM $1 ⅔ classes of stock and, as a result, allocated the transactional consideration unfairly. Compl. ¶ 91.[7] However, GM has an exculpatory charter provision pursuant to 8 *Del C.* § 102(b)(7), which bars duty of care claims against GM's directors. Thus, plaintiffs' damage claims for breach of care against the director defendants must also be dismissed.

### 3. Plaintiff's Claim that the Board Deprived Them of a Premium Under the Recap Provision Does Not State a Fiduciary Duty Claim

Aspects of plaintiffs' fiduciary duty claims do not arise purely out of the Re-cap Provision, such as those that attack generally the allocation of the deal consideration between the GMH and GM $1 ⅔ stockholders. *See Jedwab,* 509 A.2d at 594 (allegation that consideration was unfairly allocated between common and preferred implicated fiduciary duties). However, the plaintiffs' claim that the GM directors attempted in bad faith to deprive them of the premium under the Recap Provision, is "contractual rather than fiduciary." *Winston v. Mandor,* Del.Ch., 710 A.2d 835, 845 (1997).

■ Plaintiffs concede as much by asserting a breach of contract count that makes the same allegation, but using the language of contract law. This case is thus substantively indistinguishable from those in which this court found that a board's alleged evasion or breach of a charter provision for the benefit of a particular class of stockholders could be asserted only as a contract claim, not as a claim for breach of fiduciary duty.[8]

---

liability for breach of the duty of loyalty if the transaction is not "entirely fair."

**6.** The plaintiffs argue that the case of *In re FLS Holdings, Inc. Shareholders Litig.,* Del. Ch., C.A. No. 12623, mem. op. at 7, 8–9, Allen, C., 1993 WL 104562 *4 (Apr. 21, 1993) supports their complaint. However, in that case, Chancellor Allen found that a board which: ii) negotiated the allocation of merger consideration between common and preferred stockholders; ii) was "exclusively" comprised of directors who owned "large amounts of common stock" *or* were affiliates of the company's controlling common stockholder; and iii) which utilized no other fairness mechanisms such as a vote of the preferred or a special committee bore the burden to show that the merger was fair to the preferred. This case is distinguishable on two bases: the lack of any materiality of the GM directors' stockholdings and the GMH stockholder vote.

**7.** I say theoretically because I have not analyzed the claim and because the plaintiffs' allegations in this regard are quite cursory. In this regard, I note that in *Emerald Partners v. Berlin,* Del.Supr., 726 A.2d 1215, 1223 (1999), the Delaware Supreme Court disagreed with the Chancery Court's decision that disclosure claims could not be "categorized" as involving disloyalty or bad faith, but simply as involving "due care." As a result, the Supreme Court held that it was error for the Chancery Court to grant summary judgment as to those claims on the basis of a § 102(b)(7) exculpatory charter provision without examining whether there were material omissions. I do not read *Emerald Partners* as precluding a Rule 12(b)(6) dismissal of claims that the directors breached their fiduciary duty of care on the *basis* of an exculpatory charter provision so long as dismissal on that *basis* does not *thereby* preclude plaintiffs from pressing well-pleaded allegations that the directors breached their fiduciary duties of loyalty and good faith. Here, I have analyzed the plaintiffs' loyalty and good faith claims, as well as their disclosure claims, on their merits and my dismissal of those claims turns in no way on GM's exculpatory charter provision.

**8.** *See, e.g., Winston,* 710 A.2d at 841–42 (where transaction was alleged to breach preferred stockholders' right of conversion into common stock of a subsidiary at a particular

### C. Count III: Breach of the Duty of Disclosure

#### 1. Plaintiffs' Coercion Claim

■ Impermissible coercion exists "where the board ... takes actions which have the effect of causing the stockholders to vote in favor of the proposed transaction for some reason other than the merits of the transaction." *Williams*, 671 A.2d at 1382–1383 (citations omitted).

■ Here, plaintiffs contend that the vote was coerced in two respects. Primarily, plaintiffs complain that the GMH stockholders were forced to choose "between ... (i) acquiescing in defendants' unilateral elimination of the lucrative recapitalization rights, or (ii) blocking the Hughes Transactions and thereby squandering the potentially enhanced values realizable from those transactions." Pls.' Br. at 45–46. Secondarily, plaintiffs contend that it was coercive to disclose that the Hughes Transactions were entitled to tax-free treatment under recently enacted federal tax legislation and that: "If the Hughes Transactions are not consummated, any future transactions involving Hughes Defense, if structured in a manner similar to the Hughes Transactions, would be subject to this legislation and thus would cause General Motors to recognize taxable gain for U.S. income tax purposes if consummated." Sol. at 96.

Neither allegation states a claim that the stockholder vote was influenced by matters unrelated to the merits of the Hughes Transactions. The GM Board did not in any sensibly understood manner "coerce" the waiver of the Recap Provision. The GM Board had no duty to structure the Hughes Transactions so as to trigger the Recap Provision, and thereby avoid asking the GMH stockholders to choose between the potential for a premium under the Recap Provision and the deal consideration. *Cf. Brazen v. Bell Atl. Corp.*, Del.Supr., 695 A.2d 43, 50 (1997) (where $550 million termination fee was an integral part of the transaction, the fact that a no vote might have reduced the company's value by 2% was not coercive). They were permitted to structure the deal as they did so long as they did not strong-arm the GMH stockholders into voting for it.

Such strong-arming is absent here. In the event that the Hughes Transactions did not receive GMH stockholder approval, the GMH stockholders would have been in precisely the same position they were in before the vote. Their tracking stock rights in Hughes would have been unimpaired as would have been their contractual protection against a sale of substantially all of the assets of Hughes. However, if the electorate decided to choose the status quo, GM informed them that they should not expect that a future transaction "structured in a manner similar to the Hughes Transactions" could be accomplished in a tax-free manner. This information was material and informed the GMH stockholders of a reality with which GM and they had to contend. *See Williams*, 671 A.2d at 1383–1384 (possibility of delisting of shares if transaction did not receive support of 66% of the stockholders was a

exchange ratio under the corporation's certificate, plaintiffs' claim sounded in contract only); *Gale v. Bershad*, Del.Ch., C.A. No. 15714, mem. op. at 14–15, Jacobs, V.C., 1998 WL 118022 *5 (Mar. 4, 1998) (allegation that redemption of preferred shares violated certificate provisions stated a claim in contract, but not for breach of fiduciary duty); *Moore Business Forms, Inc. v. Cordant Holdings Corp.*, Del.Ch., C.A. No. 13911, mem. op. at 13, Jacobs, V.C., 1995 WL 662685 *8 (Nov. 2, 1995) (where claim hinged on specific contractual provisions protecting preferred stock-

holders, plaintiffs could not state a fiduciary duty claim); *HB Korenvaes Invs., L.P. v. Marriott Corp.*, Del.Ch., C.A. No. 12922, mem. op. at 12–13, Allen, C., 1993 WL 205040 *6 (June 9, 1993) (where the certificate "govern[ed] the propriety" of a spin-off alleged to impair the rights of the preferred stockholders, the fiduciary duty claim of those stockholders was dismissed); *Jedwab*, 509 A.2d at 594 ("[W]ith respect to matters relating to preferences or limitations that distinguish preferred stock from common, the duty of the corporation and its directors is essentially contractual").

material fact and disclosure was therefore required and did not make the vote coercive).

Thus, the GMH stockholders had a free choice between maintaining their current status and taking advantage of the new status offered by the Hughes Transactions. The opportunity to make this choice by vote carried with it a concomitant obligation on the part of the voters to accept responsibility for the outcome. Would it were that the world gave each of us the opportunity to divest the word "choose" of its close relationship to the word "between." How much of our human experience would be less trying?

But mature societies like ours recognize that freedom's psychic costs are far outweighed by its emotional, spiritual, communal, and economic benefits. Cf. *Williams,* 671 A.2d at 1381 (where "stockholders control their own destiny through informed voting ... [t]his is the highest and best form of corporate democracy"). There is much democratic wisdom in the trite phrase "you can't have your cake and eat it too." That phrase applies here. All the GMH stockholders were asked to do is to accept a new status or remain in their current status. Responsible investors must be prepared to make such choices; after all, they do so every time they buy or sell securities in the market.

The choice given to the GMH stockholders was markedly different from the choices given to stockholders in cases that have found that a stockholder vote was impermissibly coerced. In *Eisenberg v. Chicago Milwaukee Corp.,* Del.Ch., 537 A.2d 1051, 1061–1062 (1987), the stockholders were told that if they rejected a tender offer, the directors of their company would seek to delist their preferred shares. In *Lacos Land Co. v. Arden Group, Inc.,* Del.Ch., 517 A.2d 271, 277–279 (1986), the Arden stockholders were told that if they did not vote yes, then Arden's controlling stockholder would "oppose transactions that were in Arden's best interests," as a

stockholder *and* as a director and officer. That is, in each case the electorate was told that retribution would follow if the proposed transaction was defeated. Put differently, the electorate was not given an option to remain in their current position. They were put to a choice between a new position and a compromised position.

GM did not threaten to punish the GMH stockholders if they voted against the Hughes Transactions. The GMH stockholders had the freedom to choose between the status quo and the deal consideration. Having had that freedom, they must live with their decision.

### 2. *Plaintiffs' Claim That the Solicitation Statement Was Materially Misleading*

When it sought the consent of the GMH stockholders for the Hughes Transactions, the GM board had a duty to disclose all material information. *Santa Fe,* 669 A.2d at 66; *Zirn v. VLI Corp.,* Del. Supr., 621 A.2d 773, 778 (1993). "The materiality standard requires that directors disclose all facts which, under all the circumstances, would have assumed actual significance in the deliberations of the reasonable shareholder." *Id.* at 66. (quotations and citations omitted).

In defending this motion, plaintiffs have asserted that the Solicitation was materially misleading in four major respects. I will therefore address each in the words plaintiffs chose to characterize their allegations in their brief.[9] Pls.' Br. at 34, 35, 36, 40. In this context, it is appropriate to examine the plaintiffs' allegations against what was actually disclosed in the Solicitation, which was incorporated by reference into the complaint. *Santa Fe,* 669 A.2d at 69.

a. *"Defendants' Representation of 'Substantial Uncertainty' Regarding the*

---

**9.** These words appear in italics and quotes without further citation.

*... 120% Recapitalization Provision Is Materially False and/or Misleading."*

According to the plaintiffs:

Virtually in one breath, defendants represented to the GMH Shareholders that there was 'substantial uncertainty' regarding the applicability of the 120% Recapitalization provision, but that 'any possible application' was being waived (Solicitation at 7). The clear import of the linkage of these representations, and the repeated references to 'uncertainty' and 'substantial uncertainty' throughout the Solicitation, was that the GMH Shareholders were *not likely waiving anything,* because the 20% premium right likely did not apply.

Pls.' Br. at 34.

The portions of the Solicitation plaintiffs attack in this regard state as follows:

The Hughes Transactions will not result in a recapitalization of GM Class H Common Stock into GM $1 ⅔ Common Stock at a 120% exchange ratio as currently provided for under certain circumstances in the GM Certificate of Incorporation. As part of the Hughes Transactions, the GM Certificate of Incorporation will be amended to eliminate any possible application of the recapitalization provision to the Hughes Transactions. Even absent this amendment, we believe that there is substantial uncertainty as to whether the recapitalization provision would apply. By voting in favor of the Hughes Transactions, you will in effect be waiving any application of the provision to the Hughes Transactions....

\* \* \* \* \* \*

Moreover, GM management and legal counsel advised the GM Board that there was substantial uncertainty as to whether any likely strategic transactions would in fact trigger the nondiscretionary recapitalization provision of the GM Certificate of Incorporation, which is only effective upon the consummation of a sale, transfer, assignment or other disposition of substantially all of the business of "Hughes Aircraft Company" ... Principally, it was not clear whether a spin-off of Hughes Defense, while retaining Hughes Telecom, constitutes a disposition of all or substantially all of "Hughes Aircraft Company" as that term is used in the GM Certificate of Incorporation and, accordingly, there was substantial uncertainty whether such a disposition would trigger the recapitalization provision....

Sol. at 7, 110 (respectively).

Plaintiffs contend that these provisions were false and misleading because there was no reasonable basis for the assertion that the Hughes Transactions, absent waiver, would not trigger the Recap Provision. Plaintiffs do not allege facts in the complaint showing that the GM board did not honestly hold the belief that there was substantial uncertainty about the applicability of the Recap Provision or that they were not so advised by counsel. *See Santa Fe,* 669 A.2d at 66 (finding no disclosure violation in part because the plaintiffs did not allege that the board did not honestly hold a belief set forth in a statement in the disclosure document which the plaintiffs challenged as false and misleading). Rather, plaintiffs appear to argue that if they are correct in their assertion that the Recap Provision was clearly applicable to the Hughes Transactions, then it can be inferred that the defendants knew that their statements to the contrary were misleading.

In my view, this alleged violation cannot state a claim unless it is definitively clear that no reasonable person could harbor uncertainty about whether the Recap Provision would have been triggered, absent waiver. Plaintiffs contend the sale of Hughes Defense to Raytheon clearly constituted a sale of "substantially all" of Hughes Aircraft because Hughes Defense constituted over 60% of Hughes Aircraft's total assets, revenues, and net income for each of years 1993–1996.

In analogous circumstances where Vice Chancellor Steele was confronted with a certificate provision requiring a determination of what the words "substantially all" of a company's assets or business meant, he looked to case law under 8 *Del.C.* § 271 for guidance. After so doing, he succinctly summarized the teaching of those cases:

> The Supreme Court has long held that determination of whether there is a sale of substantially all assets so as to trigger section 271 depends upon the particular qualitative and quantitative characteristics of the transaction at issue. Thus, the transaction must be viewed in terms of its overall effect on the corporation, and there is no necessary qualifying percentage. Such an inquiry is factual in nature....

*Winston*, 710 A.2d at 843. As a result, transactions involving various asset percentages have been found to constitute or not constitute a sale of substantially all of a company's assets.[10]

Any wise counselor would therefore approach the question of whether a disposition of a particular division or subsidiary would involve a sale of "substantially all" of a company with extreme caution. Our jurisprudence eschewed a definitional approach to § 271 focussing on the interpretation of the words "substantially all," in favor of a contextual approach focussing upon whether a transaction involves the sale "of assets quantitatively vital to the operation of the corporation and is out of the ordinary and substantially affects the existence and purpose of the corporation." *Gimbel v. Signal Cos., Inc.*, Del.Ch., 316 A.2d 599, 606, *aff'd*, Del.Supr., 316 A.2d 619 (1974). This interpretative choice necessarily involved a policy preference for doing equity in specific cases over the value of providing clear guidelines for transactional lawyers structuring transactions for the corporations they advise. *See* 1 David A. Drexler, et. al., *Delaware Corporation Law and Practice* § 37.03 (1999) ("[*Gimbel*] and its progeny represent a clear-cut rejection of the former conventional view that 'substantially all' in Section 271 meant only significantly more than one-half of the corporation's assets.").

Therefore, the plaintiffs' attack on the Solicitation's use of the term "substantially uncertain" does not state a disclosure claim. Given the intensely factual analysis required under the *Gimbel* test and the lack of clear mathematical guidelines, the Solicitation's hesitance to take a definitive stand is understandable.[11]

10. *See, e.g., Thorpe v. CERBCO, Inc.*, Del. Supr., 676 A.2d 436, 444 (1996) (affirming a finding that a sale of stock comprising 68% of a company's assets and constituting its primary income generating asset triggers § 271); *Oberly v. Kirby*, Del.Supr., 592 A.2d 445, 464 (1991) (sale of stock comprising 80% of a foundation's assets did not trigger § 271 where the foundation was in the " 'business' of holding investment securities and donating its profits to charity") *Winston*, 710 A.2d at 843 (allegation that transaction involved sale of 60% of company's net assets was a sale of "substantially all" of the company's assets survived motion to dismiss); *Katz v. Bregman*, Del.Ch., 431 A.2d 1274, 1275–1276 (1981) (sale of assets constituting 51% of assets, 45% of sales, and 52.4% of pre-tax net operating income triggers § 271); *Gimbel v. Signal Cos.*, Del.Ch., 316 A.2d 599, 607–608, *aff'd*, Del.Supr., 316 A.2d 619 (1974) (sale of assets comprising 26% and 41% of total and net assets did not trigger § 271, even though they involved the company's oldest business line);

*Bacine v. Scharffenberger*, Del.Ch., C.A. Nos. 7862 & 7866, mem. op. at 7–8, Brown, C., 1984 WL 21128 *3 (Dec. 11, 1984) (sale of assets responsible for 53% of company's net income in 9 months prior to the sale did not trigger § 271 where, among other things, this figure seemed attributable to a bad year had by another company subsidiary).

11. The plaintiffs' brief goes to great lengths to show how "ambiguous" the language of the 120% Recap Provision is and to demonstrate that in the Solicitation "defendants considered and even conceded the ambiguity of the 120% recapitalization provision." Pls.' Br. at 28. I fail to see how this ambiguity aids the plaintiffs' case. While any ambiguity in the Recap Provision would be construed against GM, *Kaiser Alum. Corp. v. Matheson*, Del. Supr., 681 A.2d 392, 395 (1996), the fact of ambiguity supports the truthfulness of a disclosure that it was uncertain whether the Recap Provision would have been triggered by the Hughes Transactions. Moreover, the fact

Nor is this a case where the statement of belief was phrased in a manner that can be plausibly construed as inappropriately suggestive or distorting. The use of the words "substantially uncertain" throughout the Solicitation would not have led a reasonable stockholder to conclude "that the GMH Shareholders really were not likely waiving anything because the 20% premium right likely did not apply." Pls.' Br. at 34. To the contrary, the Solicitation provided clear notice to the GMH stockholders that the Recap Provision potentially applied to the Hughes Transactions, and, by implication, that the risk of applicability was great enough for GM to seek a stockholder waiver of that Provision.[12]

b. *"Defendants' Description of the Legal Advice on the 'Substantial Uncertainty' Regarding the Applicability of the 120% Recapitalization Provision Is Materially False and/or Misleading."*

The Solicitation says that "GM ... legal counsel ... advised the GM Board that there is substantial uncertainty as to whether the Hughes Transactions would trigger" the Recap Provision. Sol. at 110. According to plaintiffs, this statement constituted a walk down the dangerous road of "partial disclosure" and imposed upon the defendants the obligation to "disclose the full nature of the 'legal advice' [they] received." Pls.' Br. at 36.

In support of this contention, the plaintiffs rely on *Zirn v. VLI Corp.*, Del.Supr., 681 A.2d 1050 (1996), which they say involved "virtually identical circumstances." Pls.' Br. at 36. In *Zirn*, the board disclosed that in the view of special counsel an important patent's value was in doubt because of litigation and that there was a "significant possibility" of not prevailing at a particular stage in the litigation process. Given that this risk was disclosed and cast a shadow on the asset's value, the opinion of the same special counsel that the company had an excellent chance of upholding the patent ultimately was material because it helped put the partial disclosure in context. 681 A.2d at 1056–1058.

The Solicitation's statement regarding GM legal counsel's "substantial uncertainty" as to whether the Recap Provision applied does not involve the one-sided type of presentation at issue in *Zirn*. The Solicitation does not contain an opinion one way or the other on the applicability of the Recap Provision. Indeed, the Solicitation disclosed the fact that the plaintiffs in this litigation believe that, absent waiver, the Recap Provision would have been triggered by the Hughes Transactions and that the plaintiffs believe that the Solicitation's suggestion to the contrary was a misstatement.[13] Sol. at 99. Thus, the

---

that plaintiffs' counsel indicated at oral argument that he would be willing to give an opinion of his firm that, in the absence of waiver, there was a 70% likelihood that a court would find that the Recap Provision was triggered by the Transactions also supports, rather than undercuts, the accuracy of the disclosure.

**12.** The plaintiffs also argue that the Solicitation falsely suggests that the Hughes Transactions were "structured" so that the Recap Provision would not be triggered even in the event that the Recap Provision was not waived by stockholder vote. This claim ignores the one, clearly disclosed way in which the GM Board did "structure" the Hughes Transactions so as to avoid the Recap Provision: they structured the Hughes Transactions to become effective only if the GMH stockholders voted to waive any application of

the Recap Provision thereto. The obviousness of this structural measure is balanced by the lack of any language in the Solicitation indicating what other "structural" measures were taken to avoid triggering the Recap Provision.

**13.** The Solicitation also gave the GMH stockholders financial information regarding the GM assets to be sold in the Hughes Transactions. This information enabled the GMH stockholders, such as plaintiffs, upon advice of counsel, to make their own judgments about whether the Recap Provision was likely to be found applicable to the Hughes Transactions. *Cf. Cinerama, Inc. v. Technicolor, Inc.*, Del.Ch., C.A. No. 8358, 1991 WL 111134, at *24, Allen, C. (subsequent history omitted) (June 24, 1991) (having disclosed underlying facts regarding certain stockholder agreements, company did not have obligation to

mere fact that the Solicitation referred to the uncertainty of GM's counsel was not misleading in the absence of disclosure of its counsel's underlying legal analysis.

Plaintiffs also contend that the Solicitation is misleading because it failed to set forth "when and by whom" the legal advice regarding the Recap Provision's potential applicability was given. Pls.' Br. at 35–36 & n. 9. They further contend that the defendants were intentionally vague about that so as to "conceal the fact that such advice was given only after [January 16, 1997 when] the Board ... already had determined that the [Hughes Transactions] should be structured so as to avoid triggering the automatic recapitalization provision." Compl. ¶ 72. Putting aside the failure of the complaint to allege facts supporting their contention that the legal advice was provided after January 16, 1997, I fail to grasp the materiality of the timing or source of this legal advice. The Solicitation forthrightly states that the GM Board did not, for business reasons plaintiffs challenge, want to engage in a transaction triggering the Recap Provision. Sol. at 71–72. Moreover, the GM Board clearly structured the Hughes Transaction to avoid any such triggering.

c. *"Defendants' Purported Reasons For Rejecting 'Alternatives to the Hughes Transactions' Triggering the 120% Recapitalization Provision Are Materially False and/or Misleading."*

This claim challenges whether the GM board was acting for the reasons it said it was. Yet, the complaint does not allege facts purporting to demonstrate that the GM Board did not reach its strategic decision for the reasons set forth in the Solicitation. *Santa Fe*, 669 A.2d at 66 (noting deficiency in claim challenging statement

of belief as false and misleading where the plaintiffs fail to allege that the belief asserted was not honestly held). Rather, plaintiffs essentially argue that the reasons themselves were not ones rational business persons could hold and on that basis seem to assert that the inclusion of those reasons in the Solicitation made it materially misleading.[14]

Specifically, plaintiffs attack four of the reasons the Solicitation indicates led the GM Board to believe that the Hughes Transactions were more desirable than alternative transactions. First, plaintiffs challenge a sentence indicating that "if any strategic transaction were to result in a recapitalization of GM Class H Common Stock into GM $1 ⅔ Common Stock at a 120% exchange ratio ... substantial dilution ... would likely reduce the value of the GM $1 ⅔ Common Stock, including the new stock of that class to be issued to GM Class H Common Stockholders in any such recapitalization." Sol. at 44. The plaintiffs contend that this statement is "directly contradicted" by a different part of the Solicitation, which states that GM "cannot predict the impact on the market prices of the GM $1 ⅔ Common Stock or the New GM Class H Common Stock" that would be caused by a recapitalization of the new Class H stock issued as a result of the Hughes Transactions into GM $1 ⅔ stock at a 120% exchange ratio. *Id.* at 33.

The two statements are not contradictory. The latter statement deals with an eventuality that the GM Board was unlikely to face in the near future and involving a class of stock—the new post-Hughes Transactions Class H—without a trading history. The former dealt with the possible impact of an immediate exchange of GMH shares with a market history and

---

disclose that the agreements "in combination amounted to a lock-up"). That this is so is shown by the fact that plaintiffs based their claim on the preliminary solicitation statement GM filed with the Securities and Exchange Commission. Sol. at 99.

14. If a rational person could not reasonably hold such a belief, I might be prepared to allow this claim to proceed to discovery since in that circumstance the plaintiff would seem to have some likelihood of demonstrating that the GM board did not actually hold the belief it told the stockholders it did.

value into GM $1 ⅞ shares. That the Board considered and was prepared to take a position on such an immediate exchange hardly seems surprising; moreover, it is not clear how the Board could have proceeded responsibly without determining whether a triggering of the Recap Provision was a desirable or undesirable outcome.

That the plaintiffs disagree with the Board's judgment that the dilutive effects of such a triggering would have been harmful does not state a disclosure claim. The complaint does not allege any facts from which one can conclude that the Board did not believe that the dilutive effects were undesirable. Nor does the Solicitation's inclusion of this opinion render it misleading. Issues of this sort are the kind about which reasonable businesspersons and investors can disagree; GMH stockholders reading the Solicitation were free to make their own judgment at the ballot box based on the underlying facts set forth therein.

Plaintiffs' second attack is of like kind. The Solicitation says:

> [I]f any strategic transaction were to result in a recapitalization of GM Class H Common Stock into GM $1 ⅔ Common Stock at a 120% exchange ratio ... substantial change ... would result in the form and nature of the investment of GM Class H Common Stockholders, who would have their tracking stock investment in Hughes Electronics replaced with a conventional stock interest in all of GM's operations (rather than with a conventional stock interest in New Raytheon and a more focused tracking stock interest in Hughes Telecom as in the Hughes Transactions). The GM Board believed that most GM Class H Common Stockholders had purchased such stock in order to make a focused investment in the businesses of Hughes Electronics rather than to make a conventional in-

vestment in all of GM's businesses, and considered that the frustration of that investment objective would likely result in substantial trading activity that would exacerbate the anticipated adverse effect on market value for all investors.

Sol. at 44. Plaintiffs contend that the Hughes Transactions did exactly what this statement says the GM directors were trying to avoid: deprived the GMH stockholders of their tracking interest. Pls.' Br. at 38.

The GM Board could rationally believe that a GMH stockholder who bought GMH shares to obtain a "tracking interest" in the success of Hughes might prefer to be a direct stockholder of Raytheon (which had absorbed Hughes Defense) with a GMH tracking interest in Hughes Telecom, rather than to be a direct stockholder of GM. A rational person could conclude that the merger consideration received by the GMH stockholders, which gave GMH stockholders a continued, vested interest in all of Hughes' prior businesses except Delco, was more akin to their prior tracking interest than would be merger consideration making GMH stockholders direct stockholders in GM. A rational person could also conclude that a purchaser of a focussed tracking interest might find her investment objective to have been "frustrated" if she ended up with a conventional interest in the world's largest auto manufacturer, and that such a purchaser might well trade out of her new investment as a result.

Perhaps a corporate finance professor could answer with certainty which post-transaction interest would be most similar to a pre-transaction GMH share. The GM board was not required to act with such certainty, and its statement of its view of the matter did not render the Solicitation misleading. Again, if a GMH stockholder had a different opinion, she was free to express that view at the ballot box.[15]

---

15. Or to take her merger consideration and exchange it for GM $1 ⅔ shares in the market- place.

Plaintiffs' third challenge suffers from the same defect. This challenge is to the Solicitation's indication that the GM Board was "advised that the elimination of the GM Class H Common Stock through a recapitalization into GM $1 ⅔ Common Stock would result in the loss of GM's flexibility to issue equity interests relating to Hughes Telecom without incurring corporate-level tax and to use trading stock as a focused security for management compensation. See '—Hughes Telecom' below." Sol. at 44. Plaintiffs contend that this sentence is misleading because the Solicitation does not set forth why this was so. Pls.' Br. at 39. That is not true.

The reason why a recapitalization to eliminate the GMH shares would reduce GM's ability to use tracking stock as a "focused security for management compensation" can be discerned from the Solicitation itself. If the GMH stock was eliminated in a recapitalization and the spin off of the Hughes Telecom subsidiary, there would be no GMH stock, no Hughes Telecom subsidiary, and therefore no logical way or purpose for GM to compensate executives for operating Hughes Telecom well (or poorly) by tying their remuneration to Hughes Telecom's corporate performance through a tracking stock interest. Moreover, the Solicitation also explains why a recapitalization would "result in the loss of GM's flexibility to issue equity interests relating to Hughes Telecom without incurring corporate-level tax." The Solicitation cross-references page 46, which states: "[A] spin-off of Hughes Telecom generally would reduce GM's strategic flexibility, including the elimination of its ability to issue equity interests relating to Hughes Telecom, such as the New GM Class H Common Stock, without incurring corporate level tax."

Lastly, the plaintiffs challenge the Solicitation's indication that GM's board noted "practical difficulties and uncertainties involving the application of the recapitalization provision in the context of a complex series of strategic transactions" such as the Hughes Transactions. Sol. at 44. Plaintiffs contend that "[a]s far as 'uncertainty' regarding the 'timing of the announcement of any announcement,' none is described and it is not really clear what defendants are talking about." Pls.' Br. at 39. The Solicitation, however, states: "These difficulties included the difficulty of achieving an appropriate valuation period for any such exchange in the context of the negotiation, announcement and consummation of a strategic transaction that would be subject to substantial uncertainties as to the timing of the disclosure, the possibility of market leaks and the likelihood of consummation." Sol. at 110. Additional information regarding this issue would not have borne materially on the GMH stockholders' decision.

d. *"Defendants' Descriptions of the Purported Procedural and Financial Fairness of the Hughes Transactions Are Materially False and/or Misleading."*

The plaintiffs contend that the Solicitation "conceal[s] the fact that no special committee or other group to represent solely the holders of GMH Shares" was appointed. Compl. ¶ 69. This claim is deficient. The Solicitation clearly discloses the fact that the GM board did not set up a special committee or other special structure to negotiate on behalf of the GMH stockholders. Sol. at 76 (stating that GM did not use "separate management negotiating teams to represent different stockholder groups"). It specifically acknowledges the fiduciary duties of GM directors under its then "current" structure to "all holders of GM common stock" and the fact that these different classes could have "potentially divergent interests." Sol. at 32; *see also* Sol. at 245–246.

The plaintiffs also challenge the Solicitation for describing the Capital Stock Committee of GM's board, which played a large role in the Hughes Transactions, as a "standing committee of the GM Board, comprised entirely of independent directors of General Motors, which oversees

those matters in which the two classes of GM's common stockholders may have divergent interests." Compl. ¶ 69 (quoting Sol. at 279). Plaintiffs attack this characterization because representatives of the Capital Stock Committee owned more GM $1 ⅔ shares than GMH shares, and because the Committee was forced to represent two potentially conflicting GM constituencies at one time. The Solicitation discloses the directors' ownership interests in both GM $1 ⅔ and GMH shares, Sol. at 272–273, and states that the Capital Stock Committee "oversees those matters in which the two classes of GM's common stockholders may have divergent interests." *Id.* at 279. The GMH stockholders were thus given the material facts they needed to make their own determination regarding whether the GMH directors were "independent" or not. This disclosure was sufficient.[16] The GM Board had no duty to characterize itself or the process in a negative, self-flagellating manner. *Loudon v. Archer Daniels Midland Co.,* Del.Supr., 700 A.2d 135, 143 (1997).

Plaintiffs' attack on the Solicitation's description of the procedures used to ensure the financial fairness of the Hughes Transactions is similarly deficient. The complaint suggests that the Solicitation did not disclose that no investment bank was retained solely to evaluate the fairness of the Hughes Transactions to the GMH stockholders. Compl. ¶ 70. In fact, the Solicitation makes clear that GM did not ask "one financial advisor to consider the fairness issues only from the perspective of the GM $1 ⅔ Common Stockholders and the other financial advisor . . . only from the perspective of the GM Class H Common Stockholders. . . ." Sol. at 76.

Plaintiffs also challenge a portion of the Solicitation which states that in rendering its fairness opinion, Merrill Lynch, one of GM's financial advisors, considered the "potential negative impact of the Hughes Transactions not resulting in a recapitalization of GM Class H Common Stock into GM $1 ⅔ Common Stock at a 120% exchange ratio." Sol. at 91. This is alleged to be misleading because the Solicitation does not disclose the supposed fact that "the financial advisors' fairness opinions were conditioned upon the requirement that the 120% recapitalization provision 'not be applicable to the proposed transactions.'" Pls.' Br. at 41.

This allegation suffers from several defects. First, the Solicitation states that GM's financial advisors *did in fact* consider the Recap Provision in reaching their determinations that the consideration to be received by the GMH stockholders in the Hughes Transactions was fair from a financial point of view. Aside from the disclosure quoted above regarding Merrill Lynch's fairness opinion, the Solicitation references at other pages the consideration of the Recap Provision by Merrill Lynch and Salomon Brothers in reaching their respective conclusions that the Transactions were fair. *See* Sol. at 79–80, 91, B–3–4 (Merrill Lynch); 83, B–9 (Salomon Brothers).

Second, the reference in the Solicitation exhibit upon which plaintiffs rely in asserting that the fairness opinions did not consider the Recap Provision is taken out of context. That exhibit deals with the distribution ratio to be used in determining how the new Raytheon Class A shares would be allocated between the GMH and GM $1 ⅔ stockholders after consummation. Pls.' Br.Ex. B. Given that any such allocation would occur after consummation and that consummation would involve waiver of the Recap Provision, it makes sense that the allocation would be done on the assump-

---

16. In resolving this claim, I do not have to address plaintiffs' contention that the members of the GM Capital Stock Committee lacked independence. I do note, however, that I find elsewhere in this Opinion that plaintiffs have not pled facts compromising the Board's independence and that the disclosure's statement in this regard accords with the common usage of the term "independent director." *See Williams,* 671 A.2d at 1371 (characterizing non-management directors with small stockholdings as independent, disinterested directors).

tion that the Recap Provision would not be triggered.

Finally, any person reading the Solicitation knew that a waiver of the Recap Provision was required as a condition to receive the deal consideration. Thus, any reasonable investor would have known to compare the value of a future potential recapitalization under the Recap Provision against the immediately available value of the consideration offered in the Hughes Transactions. The potential value of such a recapitalization—a premium of approximately 20% over the trading value—was disclosed in the Solicitation as was information regarding the deal consideration. As a result, even if GM's financial advisors had not considered the value of the contingent "right" contained in the Recap Provision in determining fairness but simply had determined whether the deal consideration was fair in view of the value of Hughes, the GMH stockholders were provided with the financial information necessary to make an informed judgment for themselves.[17]

Since the complaint fails to state a claim that the Solicitation was false or misleading, or that the GM Board wrongfully coerced the GMH voters, Count III will be dismissed.

### III.

For the foregoing reasons, defendants' motion to dismiss is hereby granted. Defendants shall submit a conforming order.

---

**17.** Plaintiffs also complain that the Solicitation's assertion that the GM Board considered "all relevant aspects of the Hughes Transactions" was false because the Solicitation "nowhere ... refer[s] to the exploration by defendants of any alternatives to the Hughes Transactions which would serve to balance and satisfy both the interests of the GMH Shareholders in connection with their entitlement to the 120% premium and defendants' articulated purported concerns regarding the implementation of the Hughes Transactions." Pls.' Br. at 41. There is nothing misleading about the Solicitation in this regard. The Statement forthrightly states that the GM Board made a business judgment not to engage in a transaction triggering the Recap Provision. Sol. at 44. Therefore, it should not be surprising that it does not detail ways in which the Hughes Transactions could be accomplished at the same time as the GMH stockholders received a premium under the Recap Provision.