## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

TIMOTHY LARKIN and ELLEN HOKE, : 
Individually and on Behalf of All Others : 
Similarly Situated, : 
                           : 
          Plaintiffs, : 
                           : 
          v. :      **C.A. No. 10918-VCS**
                           : 
PRATIK SHAH, SAMUEL R. SAKS, : 
R. SCOTT GREER, PHILIP M. : 
SCHNEIDER, ALEX ZISSON, : 
GERALD T. PROEHL, RODNEY A. : 
FERGUSON, SEPEHR SARSHAR, and : 
LYNN DORSEY BLEIL, : 
                           : 
          Defendants. : 

## MEMORANDUM OPINION

Date Submitted: June 1, 2016
Date Decided: August 25, 2016

James R. Banko, Esquire and Derrick B. Farrell, Esquire of Faruqi & Faruqi, LLP, Wilmington, Delaware and Juan E. Monteverde, Esquire and Miles D. Schreiner, Esquire of Faruqi & Faruqi, LLP, New York, New York, Attorneys for Plaintiffs

William M. Lafferty, Esquire, D. McKinley Measley, Esquire and Richard Li, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Koji Fukumura, Esquire, Peter Adams, Esquire and Blake Zollar, Esquire of Cooley LLP, San Diego, California, Attorneys for Defendants

SLIGHTS, Vice Chancellor

In May 2015, Teva Pharmaceuticals Industries, Inc. acquired Auspex Pharmaceuticals, Inc. in a two-step, medium-form merger pursuant to Section 251(h) of the Delaware General Corporation Law. No Auspex stockholders sought to enjoin the transaction. Plaintiffs are former stockholders of Auspex who brought this putative class action to challenge the propriety of the merger and seek post-closing damages. They allege the members of Auspex's board of directors breached their fiduciary duties by permitting senior management to conduct a flawed sales process that ultimately netted stockholders inadequate consideration for their shares.

The Verified Amended Class Action Complaint ("Complaint") presents a familiar theme as the backdrop for Plaintiffs' breach of fiduciary duty clams. Several members of the Auspex board, including its President and CEO who led the Auspex negotiation team, have ties to venture capital firms that are invested, to varying degrees, in Auspex's common stock. According to Plaintiffs, these members of the board, motivated to monetize the investments of the venture capital firms with which they were affiliated, caused Auspex to enter into the first all-cash deal they could land without regard for other deal structures or superior transactions that would have yielded better value for Auspex's public shareholders.

The legal theories upon which Plaintiffs rest their claims have evolved substantially since they initiated this litigation. It now appears their showcase

1

theory is that the Court must review the transaction for entire fairness because the venture capital funds that owned stock in Auspex controlled the Auspex board and, spurred by self-interest, caused the conflicted board to approve an ill-advised transaction with Teva at the expense of Auspex's other stockholders. Alternatively, they allege that entire fairness applies because a majority of the Auspex board labored under actual conflicts of interest throughout the process of negotiating and approving this merger. According to Plaintiffs, under these circumstances, even an overwhelming approval of the transaction by uncoerced, fully informed, disinterested stockholders cannot relieve the Defendants of the burden to prove that the transaction was entirely fair.

The directors have moved to dismiss Plaintiffs' Complaint under Rule 12(b)(6) on two grounds. First, they contend that the board is entitled to the presumptions of the business judgment rule because Auspex stockholders voiced their disinterested, fully informed, uncoerced approval of the transaction by tendering a majority of outstanding Auspex shares to Teva. Second, they point to the exculpatory clause in Auspex's certificate of incorporation and argue that Plaintiffs have failed to plead a non-exculpated breach of fiduciary.

For reasons that follow, I conclude that the motion to dismiss must be granted. Even accepting Plaintiffs' well-pled facts as true, I am satisfied that the Defendants are entitled to invoke the irrebuttable business judgment rule.

2

Plaintiffs have not pled facts that would allow a reasonable inference that the merger involved a controlling stockholder, much less that a controlling stockholder pushed Auspex into a conflicted transaction in which the controller received non-ratable benefits. They are left, then, to overcome the cleansing effect of stockholder approval, which in this case was disinterested, uncoerced and fully informed. In the absence of a controlling stockholder that extracted personal benefits, the effect of disinterested stockholder approval of the merger is review under the irrebuttable business judgment rule, even if the transaction might otherwise have been subject to the entire fairness standard due to conflicts faced by individual directors. Having reached this conclusion, I need not address Plaintiffs' *Revlon* claim or Defendants' argument that Plaintiffs have failed to plead non-exculpated claims.[1]

## I. BACKGROUND

Consistent with Court of Chancery Rule 12(b)(6), I have drawn the facts from well-pled allegations in the Complaint, documents the Complaint incorporated by reference, and judicially noticeable facts available in public SEC filings.[2] The Complaint referenced and relied upon Auspex's Form 14D-9 dated

---

[1] Plaintiffs have asserted a *Revlon* claim as a final fallback. *See Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986).

[2] *See Solomon v. Armstrong*, 747 A.2d 1098, 1126 n.72 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000); *see also Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JB*

3

April 7, 2015 (the "Recommendation Statement") for substantive facts integral to its challenges to the deal's price and process.[3] Accordingly, in addition to the facts alleged in the Complaint, I have considered facts in the Recommendation Statement in addressing this motion to dismiss.[4]

## A. The Parties and Relevant Non-Parties

Plaintiffs Timothy Larkin and Ellen Hoke owned common stock in Auspex at the time of the merger. The Defendants are Pratik Shah, Samuel R. Saks, R. Scott Greer, Philip M. Schneider, Alex Zisson, Gerald T. Proehl, Rodney A. Ferguson, Sepehr Sarshar, and Lynn Dorsey Bleil. Each served on Auspex's board of directors (the "Board") during the events leading up to the challenged merger.

Shah has served as Auspex's President and CEO since October 2013. Throughout the negotiations and consummation of the merger, Shah was a partner at Thomas, McNerney & Partners, a venture capital firm that owned approximately 15.2% of Auspex's outstanding common stock at the time of the merger. Zisson has been a partner at Thomas, McNerney since 2002 and has represented Thomas, McNerney's interests on the Auspex Board since October 2013.

*Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (noting that the Court may consider documents "integral to a plaintiff's claim and incorporated into the complaint" when considering a motion to dismiss).

[3] Compl. ¶¶ 15, 77, 109, 112, 114, 119, 124–29.

[4] *See* Transmittal Aff. of Richard Li in Supp. of Defs.' Opening Br. in Supp. of Their Mot. to Dismiss ("Li Aff.") Ex. A (Recommendation Statement).

Ferguson, who served on Auspex's board from January 2013 through the merger's consummation, is a managing director at Panorama Capital, L.P., a venture capital firm specializing in technology and life sciences investments. Panorama owned approximately 7.9% of Auspex's common stock at the time of the merger. Thomas, McNerney and Panorama's combined ownership interests thus amounted to 23.1% of Auspex's outstanding common stock before the merger.[5]

Non-party Auspex is a Delaware corporation with its principal executive offices in San Diego, California. Before the merger, it operated as a late-clinical stage biopharmaceutical company developing medications for hyperkinetic movement disorders and other rare diseases. Through the merger, it became Teva's wholly-owned subsidiary.

Non-party Teva is a global pharmaceutical company headquartered in Israel. It is the world's largest generic drug producer and has approximately 43,000 employees in 60 counties.

---

[5] These two venture capital firms shall collectively be referred to as the "VC Stockholders." The Complaint contains allegations about a third venture capital firm called Deerfield Management Co. Compl. ¶¶ 58–65. The punchline of these allegations is that Greer, Schneider and Saks "were conflicted by virtue of their relationships with . . . companies in which Deerfield maintains significant holdings." *Id.* ¶ 65. Plaintiffs waived this argument by omitting it entirely from their Brief in Opposition to Defendants' Motion to Dismiss ("Answering Brief" or "Answering Br."), and I do not discuss it further below. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

B. **Auspex Sets Out to Address its Capital Needs**

Before the challenged merger, Auspex was in the process of developing a number of medications to treat movement disorders. Its marquee product, referred to as "SD-809," was under development to treat several conditions, including chorea associated with Huntington's disease, tardive dyskinesia, and tics associated with Tourette syndrome. Auspex's product pipeline included other drugs designed to treat similar afflictions.

Developing drugs like SD-809 and shepherding them through regulatory approvals processes is expensive. In need of cash to fund its clinical programs, Auspex considered a number of strategic options in 2014. In February 2014, Auspex alleviated some of its capital needs by completing a successful initial public offering at a price of $12 per share. Thereafter, for the balance of 2014 and into 2015, Auspex entertained strategic acquisition overtures from a number of potential partners.

Plaintiffs allege that the Board, aware that four of its seven members were conflicted, preemptively added new directors who might help sterilize any deal ultimately secured.[6] With a potentially conflicted transaction in mind, the Complaint alleges that, in the midst of acquisition talks, Auspex's board "suddenly

---

[6] Compl. ¶ 69.

and without explanation"[7] adopted a resolution to expand from seven to nine members. Soon after, on May 6, 2014, Auspex announced that Bleil and Greer had been appointed as new directors. Upon joining the Board, Bleil and Greer were given the option to purchase 20,000 shares of Auspex stock at an exercise price of $18.13. That offer was more generous than stock options offered to past incoming directors, who had received options to buy up to 13,333 shares.

Between April 2014 and March 2015, Auspex discussed the prospect of undertaking a strategic transaction with no fewer than twenty-two different companies. Both the Complaint and the Recommendation Statement describe Auspex's discussions with six of these companies—referred to as Companies A, B, C, D, E and Teva.

## C. Early Negotiations

The Recommendation Statement discloses that outside suitors contacted Auspex as early as October 2013, when Company A approached Auspex about a potential strategic partnership.[8] Between then and October 2014, Auspex held discussions with Companies A, B, C, D, E and Teva to discuss potential transactions.[9] The Auspex Board discussed these developments with Auspex's

---

[7] *Id.*

[8] Recommendation Statement 17.

[9] *Id.* 17–18. The Recommendation Statement reports that Auspex executed new confidentiality agreements to facilitate the discussions with Companies A, B, E and Teva

senior management at a regularly-scheduled meeting on October 30, 2014.[10] At that meeting, the Board expressed its concern that a protracted exploratory process could detract from SD-809's regulatory approvals and testing prospects and thereafter "directed management to get clarity on possible strategic interest by the first quarter of 2015."[11]

On December 16, 2014, Auspex announced that SD-809 earned positive efficacy and safety results in recent "Phase 3" testing for the drug's capacity to treat Huntington's chorea. Shortly after the announcement, Auspex's stock price doubled and Companies D and E reached out to Auspex to discuss an acquisition. Shah informed Company E that the Board sought a finalized deal by the end of the first quarter, 2015.

Early in 2015, the Board approved equity grants to Shah and Saks "[d]espite knowing that . . . Shah was in the midst of leading a sale process and that any potential buyer would have to pay a premium to acquire the Company."[12] Shah received 200,000 stock options and 100,000 restricted stock units and Saks

---

and operated under an existing confidentiality agreement for its discussions with Company C.

[10] *Id.* 18.

[11] *Id.*

[12] Compl. ¶ 78.

received 30,000 stock options and 15,000 restricted units. These securities were to vest either over a four year period or upon the completion of a merger.

Auspex's senior management met with twenty-two pharmaceutical companies, including Companies A–E and Teva, during the J.P. Morgan Global Healthcare Conference in San Francisco between January 13 and 16, 2015. J.P. Morgan Securities LLC, while "in consultation with Shah,"[13] independently discussed potential acquisition strategies with Companies B, C, D, E and others. At a January 14, 2015 meeting, Company B indicated to Auspex's senior management that it expected to complete its internal due diligence and make an acquisition offer to Auspex by mid-February. Company D and Teva also expressed interest.

Talks with Companies B, D and Teva continued through mid-February. Shah and representatives of Auspex's senior management team led these discussions with minimal Board oversight. On February 5, Auspex and Company D entered into a confidentiality agreement containing mutual standstill provisions "and other customary terms."[14] Several days later, during an in-person meeting with Teva in Israel, Shah conveyed the Board's preference to receive acquisition proposals by the end of the first quarter, 2015. On February 10,

---

[13] Recommendation Statement 19.

[14] Compl. ¶ 90; *see* Recommendation Statement 20.

Company B indicated that it needed more time to prepare and present its offer. The next day, Company D made a stock-and-cash offer to acquire Auspex in a deal valuing Auspex between $2.1 and $2.2 billion. Shah, acting without prior Board approval, advised Company D that its offer would not be competitive unless it included a more significant cash component.

## D. The Field Narrows

Deal talks took on more focus after a Board meeting held on February 16 and 17, 2015. During that meeting, the Board received updates on the status of negotiations and discussed Auspex's strategic alternatives. It also agreed to retain J.P. Morgan as Auspex's financial advisor and assigned Shah, senior management, and J.P. Morgan the task of selecting a pool of potential strategic acquirers. After the meeting, Shah, senior management, and J.P. Morgan contacted Teva and eight additional pharmaceutical companies, including Companies B, C, D, and E, to gauge interest. Of those contacted, only Teva and Companies B, C, D, and E chose to remain in the process. Companies B and E dropped out by mid-March.

On February 24, Teva submitted a proposal to acquire Auspex in an all-cash transaction for between $85 and $95 per share, which implied an equity value of between $3.0 to $3.3 billion. Representatives from both sides held a series of due diligence meetings between March 11 and 13. On March 13, Shah instructed J.P. Morgan to send Teva a form merger agreement and process letter requesting a

10

proposal by March 23. The form merger agreement, which no other contender received, contemplated an all-cash, two-step merger with a termination fee totaling 2.5% of Auspex's equity value.

On the same day J.P. Morgan sent that letter, Auspex representatives were also in touch Companies C and D. Company D sent along two non-binding proposals packaged as alternatives: the parties could pursue either (1) a stock-and-cash buyout valuing Auspex at $3 billion and including "contingent value rights of $500 million tied to future regulatory milestones"; or (2) an asset sale and spinoff valued at $2.5 billion in which Company D would acquire two compounds (including SD-809) and Auspex's remaining "central nervous system assets" would be spun off as a new public company. Around this same time, J.P. Morgan, acting on Shah's instruction, told Company C it would need to submit a proposal by March 23 in order to remain in the process.

During a March 17 teleconference in which the Board, senior management, and Auspex's legal and financial advisors participated, Shah summarized the state of negotiations, including Teva and Company D's competing proposals, as well as Company C's purported interest in submitting an offer. The Board expressed concerns over certain tax aspects of Company D's spin-off proposal but nonetheless instructed Shah and J.P. Morgan to inform Company D that Auspex remained interested and that Company D's proposal required revisions to remain

11

competitive. It is unclear whether anyone in fact followed up with Company D by passing this guidance along; the Recommendation Statement is silent on the matter and the Complaint merely speculates that no follow up occurred.[15] The Board further directed that talks with Teva should continue and instructed Shah and J.P. Morgan to press Company C to submit a proposal.

On March 20, Company C withdrew from the process. Plaintiffs allege that Company C explained to an Auspex representative that Company C "required additional time to conduct diligence that could not feasibly be concluded within the timeframe demanded by Auspex" and that Shah was unwilling to extend Company C's time to prepare and submit a proposal.[16] Teva likewise asked for more time to revise its offer after March 23. Shah agreed to this extension on the condition that Teva execute a merger agreement by the end of March. Thus, past March 20, only Company D and Teva remained in the running.

### E. Auspex's Compensation Committee Approves Tax Reimbursements for Certain Directors

During a March 26 meeting, Auspex's Compensation Committee (consisting of Ferguson, Greer, Proehl, and Zisson as chair), discussed a grant of cash payments to Shah, Saks, and Sarshar as compensation for taxes they would owe in

---

[15] Compl. ¶ 114.

[16] *Id.* ¶¶ 111–12.

connection with the merger with Teva they now believed was imminent (the "Tax Reimbursements"). The Committee ultimately recommended that the Board approve a payment of $7.7 million to Shah and an aggregate payment of about $2 million to Saks and Sarshar.

## F. The Board Selects Teva and the Parties Complete a Merger

On March 27, Teva increased its all-cash offer to $101 per share, representing an equity value of $3.5 billion. The Board convened with senior management the next day and, after hearing presentations from its legal and financial advisors, authorized management and its advisors to finalize a merger agreement with Teva at the $101 per share price. On March 29, the Board met again with senior management and legal and financial advisors and, after receiving J.P. Morgan's fairness opinion, voted unanimously in favor of both the Teva merger and the grant of Tax Reimbursements to Shah, Saks and Sarshar.

Auspex and Teva structured the transaction as a two-step merger contemplating a first-step tender offer and back-end merger as prescribed by 8 *Del. C.* § 251(h). In a publicly filed Schedule 13D dated March 29, 2015, Auspex disclosed that a tender agreement (the "Tender and Support Agreement") had been executed by Auspex stockholders owning about 27% of outstanding shares. The participating stockholders, including Auspex's directors, Thomas, McNerney,

Panorama and others, agreed to tender their stock in the upcoming tender offer and, if necessary, vote in favor of the merger.[17]

Auspex filed the Recommendation Statement with the SEC on March 30. In that filing, the Board urged stockholders to tender their shares and listed a number of reasons in support of that recommendation, including that Teva's all-cash offer would provide stockholders with immediate value and liquidity; that the $101 per share merger consideration represented a 42.4% premium to Auspex common stock's March 27 closing price; that arm's length negotiations successfully pushed Teva to offer the highest price it was willing to pay; and that the risks involved with merging outweighed those of building the commercial infrastructure necessary to launch and market SD-809 as a standalone company.[18] Further, the Recommendation Statement reported that management-generated projections the Board used to evaluate the Company's strategic alternatives assumed that SD-809 had a 90% chance of being successfully launched to treat Huntington's chorea, 50% for tardive dyskinesia, and 30% for Tourette syndrome.[19]

---

[17] Transmittal Aff. of James R. Banko in Supp. of Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss ("Banko Aff.") Ex. C (Schedule 13D) sched. B. The Court takes judicial notice of this document and its contents.

[18] Recommendation Statement 25–26. This list is not exhaustive.

[19] *Id.* 29.

During the tender offer period that commenced on April 7, 2015 and closed on May 5, 2015, stockholders owning 78% of Auspex's outstanding common stock tendered their shares to Teva in the first step of the two-step transaction. Thus, roughly 70% of outstanding shares not contractually bound to support the transaction tendered.[20] Because more than 50% of Auspex's outstanding shares were tendered to Teva, the merger occurred by operation of Section 251(h) without a stockholder vote.

On June 16, 2015, Teva announced that SD-809 had received positive test results for the treatment of both Huntington's disease and Tourette syndrome (the "June Test Results"). After that information was released, market commentators opined that Auspex had developed a product pipeline that would support "multiple platforms for growth" and that Auspex was "expected to be accretive to non-GAAP EPS beginning in 2017 and meaningfully accretive thereafter."[21] Plaintiffs amended their first complaint, which had been filed April 16, 2015, just over a month after the June Test Results surfaced.

---

[20] This percentage is the quotient that results from dividing 73%, the total percentage of Auspex stock not contractually bound to tender, by 51%, the percentage of stock not contractually bound that did in fact tender.

[21] Compl. ¶ 14.

## II. PROCEDURAL STANDARD

Defendants' motion challenges the Complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "The pleading standards governing the motion to dismiss stage of a proceeding in Delaware . . . are minimal."[22] The operative standard is one of "reasonable conceivability."[23] Under this standard, Delaware courts will

> accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[24]

The court must view well-pled facts in a light most favorable to the nonmovant, but need not give weight to conclusory allegations lacking specific factual bases.[25] The court may grant the motion only if, based on properly reviewable facts, there is no "reasonable possibility that the plaintiff could recover."[26]

---

[22] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[23] *Id.* at 537 (internal quotation marks omitted).

[24] *Id.* at 536.

[25] *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 256 (Del. Ch. 2006).

[26] *In re Answers Corp. S'holder Litig.*, 2012 WL 1253072, at *6 (Del. Ch. Apr. 11, 2012).

### III.  ANALYSIS

Plaintiffs' theory of the case has evolved.  The Complaint seeks to invoke entire fairness review by alleging that "[t]he merger was the result of an inadequate sales process led by conflicted directors."[27]  The term "controlling stockholder," or any derivation of the term, appears nowhere in the Complaint.  The lead off argument in Plaintiffs' Answering Brief, however, is that entire fairness applies because controlling stockholders derived "unique benefits from the Transaction."[28]  The "conflicted directors" theory takes a back seat and consumes just three pages of the Plaintiffs' forty-page brief.[29]

Plaintiffs' controlling stockholder argument focuses on the VC Stockholders and their affiliated board members Shah, Zisson, and Saks (the "VC Directors").

---

[27] Compl. at 25.

[28] Answering Br. 18.  As noted, the operative Complaint in this action was filed on July 27, 2015.  Just over two months later, but before any briefs on this motion were filed, the Delaware Supreme Court issued *Corwin v. KKR Financial Holdings, LLC*, 125 A.3d 304 (Del. 2015), a decision that, for reasons made clear below, has become central to both sides' positions.

[29] Answering Br. 33–35.  That this controlling stockholder theory first came into focus in Plaintiffs' Answering Brief is troubling.  *See Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *4 (Del. Ch. Jan. 18, 2013) ("An answering brief . . . is not the ideal forum for expanding claims."); *cf. Zucker v. Andreesen*, 2012 WL 2366448, at *2 (Del. Ch. June 21, 2012) (identifying difficulties that arise, particularly by operation of Rule 15(aaa) in the motion to dismiss context, when a plaintiff attempts to "supplement the complaint through [his or her] brief" (internal quotation marks omitted) (quoting *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *5 (Del. Ch. May 5, 2010)).  Nevertheless, Defendants have addressed the issue in their Reply Brief in Support of Their Motion to Dismiss and, for the sake of completeness, I will address it here.

Specifically, they allege that the VC Stockholders leveraged their substantial ownership stakes and Board representation in Auspex to manipulate negotiations and secure a fast, all-cash transaction that satisfied their unique liquidity needs. According to Plaintiffs, the VC Stockholders, working in conjunction with the VC Directors, spearheaded a rushed sales process to ensure Auspex would find a suitor willing to pay cash. The need for speed was driven, in large part, by impending and likely positive SD-809 test results that would spike Auspex's stock price and thereby extinguish the possibility of a hurried, all-cash sale. This fixation on speed and liquidity, Plaintiffs argue, motivated Shah to favor Teva as the only all-cash bidder, a preference that ultimately hamstrung the Board into accepting a deal that, although facially appealing, failed to maximize Auspex's value.

Plaintiffs' fallback position is that a majority of directors who approved the deal were unable to act in the stockholders' best interests due to various disabling conflicts of interest, including contemporaneous employment with the two venture capital firms, post-merger employment offers with the surviving entity (Auspex), and special compensation opportunities that were offered to ensure their loyalty to Shah. These conflicts caused the majority of directors consciously to abdicate their fiduciary duties by entrusting Shah, a director with known ties to Thomas, McNerney, with *de facto* control over the bidding process and rubber-stamping a

18

deal that he engineered.[30]   Plaintiffs also make veiled arguments that the Defendants acted in bad faith, but only in passing.[31]

Defendants counter on all fronts, arguing that the business judgment rule applies because there is no controller, the Board was not interested, the alleged misconduct does not rise to the level of bad faith, and the Board was fully informed.   Defendants further urge the Court to defer to the Board's business judgment given the cleansing effect of the disinterested stockholders' uncoerced, fully informed decision to approve the transaction by tendering their shares. By Defendants' lights, the Supreme Court's decisions in *Corwin v. KKR Financial*

---

[30] At oral argument, Plaintiffs manufactured an argument that the Auspex board acted without due care, both by failing to "sufficiently inform themselves of Auspex's value" and by allowing Shah to withhold information from them about key developments in the bidding process.  Oral Arg. Tr. ("Tr.") 42.  The argument was difficult to follow and, in any event, any facts that might support it are not well-pled in the Complaint.  Moreover, given my conclusion regarding the effect of the stockholder approval of the transaction, any breach of the duty of care has been cleansed.  For this reason, I decline to address this or Plaintiffs' *Revlon* argument on the merits, beyond noting my skepticism that either claim could survive Defendants' argument that they are subject to the exculpatory clause in Auspex's certificate of incorporation.  8 *Del. C.* § 102(b)(7).

[31] Answering Br. 3, 14, 37, 40 (asserting in conclusory fashion that the Board's conduct amounted to bad faith); *id.* 36 (arguing, in the span of two sentences, that the Board's conduct amounted to bad faith).

*Holdings LLC*[32] and *Singh v. Attenborough,*[33] as well as this court's recent decision in *In re Volcano Corp. Stockholder Litigation,*[34] are on all fours and controlling.

This opinion resolves Defendants' motion to dismiss in three parts. First, I address the gating question that largely dictates the end result: what standard of review applies to Auspex's merger with Teva? I conclude that, by operation of *Corwin* and related authority on the legal effects of stockholder approval, the irrebuttable business judgment rule applies, a holding that extinguishes all challenges to the merger except those predicated on waste. Second, I conclude that the Complaint does not a state a claim for waste for the simple reason that Plaintiffs have not pled it. Those two conclusions dispense with the Complaint in its entirety. The third and final issue is whether Plaintiffs should be permitted to resuscitate their Complaint by amendment. Applying Court of Chancery Rule 15(aaa), I conclude that no further amendment should be granted.

### A. The Standard of Review: Entire Fairness or Business Judgment Rule?

My analysis of the applicable standard of review follows three analytical markers: (1) when disinterested, fully informed, uncoerced stockholders approve a transaction absent a looming conflicted controller, the irrebuttable business

---

[32] 125 A.3d 304 (Del. 2015).

[33] 137 A.3d 151 (Del. 2016).

[34] 2016 WL 3626521 (Del. Ch. June 30, 2016).

judgment rule applies; (2) there was no looming conflicted controller in this case; and (3) the challenged merger was properly approved by disinterested, uncoerced Auspex stockholders.[35] Under the circumstances, the business judgment rule, irrebuttable in this context, applies. While the analytical path could be inverted and still lead to the same result, this order is appropriate here since the first of the three propositions has been the subject of greatest debate among the parties. Before addressing the merits of the motion, however, I begin with a brief review of the competing standards of review proffered by the parties.

Section 141 of the Delaware General Corporation Law empowers the board of directors of a Delaware corporation to manage the corporation's business and affairs.[36] In discharging that function, directors owe the corporation and its stockholders unremitting fiduciary duties of loyalty and care.[37] The standard of review that guides the court's determination of whether those duties have been violated defaults to a deferential standard, the business judgment rule, which directs the court to presume the board of directors "acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of

---

[35] By "proper stockholder approval," I refer hereafter to an uncoerced, fully informed vote or tender of a majority of outstanding shares owned by disinterested stockholders.

[36] 8 *Del. C.* § 141(a).

[37] *Cede & Co. v. Technicolor*, 634 A.2d 345, 360 (Del. 1993).

21

the company."[38] In circumstances where the business judgment rule applies, Delaware courts will not overturn a board's decision unless that decision "cannot be attributed to any rational business purpose."[39] This broadly permissive standard reflects Delaware's traditional reluctance to second-guess the business judgment of disinterested fiduciaries absent some independent cause for doubt.[40]

The business judgment presumption is not irrebuttable; indeed, several avenues exist to cause the court to employ a more searching review of the board's decision making.[41] For instance, Delaware courts will apply the most stringent level of review, entire fairness, in circumstances where: (1) properly reviewable facts reveal that the propriety of a board decision is in doubt because the majority of the directors who approved it were grossly negligent, acting in bad faith, or tainted by conflicts of interest;[42] or (2) the plaintiff presents facts supporting a

---

[38] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[39] *Cede*, 634 A.2d at 361 (internal quotation marks omitted) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[40] *Cf., e.g.*, *Corwin*, 125 A.3d at 313–14 ("[T]he core rationale of the business judgment rule . . . is that judges are poorly positioned to evaluate the wisdom of business decisions and there is little utility to having them second-guess the determination of impartial decision-makers with more information (in the case of directors) or an actual economic stake in the outcome (in the case of informed, disinterested stockholders).").

[41] *E.g.*, *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006); *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *9 (Del. Ch. Oct. 24, 2014).

[42] *E.g.*, *Disney*, 906 A.2d at 52–53; *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002).

reasonable inference that a transaction involved a controlling stockholder.[43] Importantly, the presence of a controlling stockholder does not *per se* trigger entire fairness. Rather, exacting judicial review is warranted only where the controller "engage[s] in a conflicted transaction."[44] Conflicted transactions include those in which the controller stands on both sides of the deal (for example, when a parent acquires its subsidiary),[45] as well as those in which the controller stands on only one side of the deal but "competes with the common stockholders for consideration."[46] In either circumstance, entire fairness review will apply *ab initio*.[47]

As discussed in *Kahn v. M&F Worldwide Corp.*, and its forerunners and progeny, cases where the controller stands on both sides of the transaction present a particularly compelling reason to apply entire fairness: both corporate decision-

---

[43] *Crimson*, 2014 WL 5449419, at *9 (identifying and describing both scenarios).

[44] *See id.* at *14.

[45] *E.g.*, *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014).

[46] *Crimson*, 2014 WL 5449419, at *12; *see also In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 486 (Del. Ch. 2013) ("When a corporation with a controlling stockholder is sold to a third party, the entire fairness standard applies if the controlling stockholder receives a benefit not shared with the minority."); *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1034 (Del. Ch. 2012) ("[T]he plaintiffs must plead that [the alleged controller] had a conflicting interest in the Merger in the sense that he derived a personal financial benefit 'to the exclusion of, and detriment to, the minority stockholders.'" (quoting *Sinclair*, 280 A.2d at 720)).

[47] *Emerald P'rs v. Berlin*, 787 A.2d 85, 93 (Del. 2001).

23

making bodies to which Delaware courts ardently defer—the board of directors and disinterested voting stockholders—are considered compromised by the controller's influence.[48] That is, the controller's presence is said to exert "inherent coercion"[49] on both constituencies such that neither can "freely exercise their judgment" for reasons that vary among the constituencies in question.[50] Directors, on the one hand, might feel beholden to a controller who placed them on the board, supported them during election season, or could fire them at any moment.[51] Stockholders, on the other hand, might generally hesitate to vote against a controller's known preferred outcome because they are resigned to the inevitability

---

[48] *M&F Worldwide*, 88 A.3d at 644 ("[E]ntire fairness . . . is applied in the controller merger context as a substitute for the dual statutory protections of disinterested board and stockholder approval, because both protections are potentially undermined by the influence of a controller."); *Crimson*, 2014 WL 5449419, at *9 (same); *see In re Cysive, Inc. Shareholders Litig.*, 836 A.2d 531, 548 (Del. Ch. 2003) ("The rationale for [the burden-shifting mechanism established in *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994)] is that the potential power of the controlling stockholder to act in ways that are detrimental to independent directors and unaffiliated stockholders is supposedly so formidable that the law's prohibition of retributive action and unfair self-dealing is insufficient to render either independent director or independent stockholder approval a reliable guarantee of fairness."); *cf. In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *33 (Del. Ch. Sept. 4, 2014) ("Absent [the procedural protections listed in *M&F Worldwide*], a minority stockholder's challenge to a transaction in which a controlling stockholder stands on both sides implicates the entire fairness standard of review.").

[49] *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002).

[50] *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).

[51] *Pure Res.*, 808 A.2d at 436.

24

of that outcome or fear retribution in some form if they resist—for example, the controller might withhold dividends or find other means to extract value from the entity.[52]   For these reasons, entire fairness applies to two-sided controller transactions unless a comprehensive set of procedural protections—that the *M&F Worldwide* court summarized as "disinterested board and stockholder approval"— operate to restore the court's confidence in both constituencies' decisions.[53]   Use of one protection or the other, however, only partially alleviates extant concerns, and therefore merely shifts the burden of persuasion from the defendants to the plaintiffs.[54]

Transactions where the controller is on only one side of the transaction also face entire fairness scrutiny to assuage the risk that a controller who stands to earn "different consideration or some unique benefit" will flex his control to secure that

---

[52] *Id.*

[53] *See M&F Worldwide*, 88 A.3d at 645 (listing the following six conditions that, if met, reduce the standard of review in "controller buyout" contexts to business judgment: "(i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority").

[54] *Id.* at 646; *Lynch*, 638 A.2d at 1117.

self-interested deal to the detriment of minority stockholders.[55] The dual

procedural protections referenced in *M&F Worldwide* operate similarly in the one-

sided controller context.[56]

As noted, Plaintiffs argue that the business judgment rule does not apply

either because the Auspex merger is a one-sided controller transaction (triggering

entire fairness) or its presumptions have been rebutted by individual director self-

interest (also triggering entire fairness). Critically, Plaintiffs also argue that

---

[55] *Synthes*, 50 A.3d at 1033 (Del. Ch. 2012) ("The argument in [the one-sided controller transaction] context is that the controller used its power over the company to cause the company to enter into a transaction that was not equal to all the stockholders, and unfair to the minority because the controller unfairly diverted proceeds that should have been shared ratably with all stockholders to itself."); *see Frank v. Elgamal*, 2014 WL 957550, at *28 (Del. Ch. Mar. 10, 2014) ("Under the reasoning articulated in *In re John Q. Hammons Hotels Inc. Shareholder Litigation*, because a stockholder with a controlling interest 'could effectively veto any transaction,' the Court should subject a transaction to entire fairness review, even if the controlling stockholder does not stand on both sides, where the controlling stockholder and the minority stockholders are 'competing' for the consideration of the acquirer." (quoting *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009)).

[56] *See Frank*, 2014 WL 957550, at *28 ("Both *Lynch* and *Hammons* teach that, if the transaction was either recommended by a special committee or approved in a non-waivable majority-of-all-the-minority vote, then the entire fairness standard of review still applies but the burden shifts to the plaintiff to prove that the transaction was not fair."); *Hammons*, 2009 WL 3165613, at *12 & n.38 (clarifying that the one-sided controller transaction at issue was "not governed by *Lynch*," a case involving a two-sided controller transaction, and holding that "business judgment would be the applicable standard of review if the transaction [where the controller stands on only one side] were (1) recommended by a disinterested and independent special committee, *and* (2) approved by the stockholders in a non-waivable vote of the majority of all the minority stockholders.").

Auspex stockholders' 78% tender has no effect on the applicable standard of review under either scenario. I disagree.

## 1. When fully informed, disinterested, uncoerced stockholders approve a transaction absent a looming conflicted controller, the irrebuttable business judgment rule applies.

In *Corwin*, our Supreme Court affirmed this court's adherence to the "proposition that when a transaction *not subject to the entire fairness standard* is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[57] In this case, it is undisputed that stockholders owning 78% of Auspex's shares, including about 70% of shares not subject to the Tender and Support Agreement, voiced their approval of the challenged merger by tendering their shares. The parties dispute whether this show of support has the cleansing effect referenced in *Corwin*. This dispute exists on several levels—including, in descending order of logical primacy: (1) will stockholder approval cleanse a transaction subject to entire fairness review, and if so, in all such transactions or only some?; (2) if not all transactions reviewed for entire fairness can be cleansed by majority stockholder approval, is this merger subject to

---

[57] 125 A.3d at 309 (emphasis supplied); *see In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 1001–03 (Del. Ch. 2014).

cleansing?; and (3) does the 78% tender qualify as a "fully-informed, uncoerced vote of the disinterested stockholders?"[58]

The first inquiry, in practical terms, really asks: what did *Corwin* mean by "a transaction not subject to the entire fairness standard"?[59] Plaintiffs sponsor a rigorously literal reading of that text—that is, that *all* transactions subject to entire fairness for *any reason* cannot be cleansed under *Corwin*. Defendants urge the Court to consider contextual cues and the authority undergirding *Corwin*, both of which strongly suggest that the only transactions that are subject to entire fairness that cannot be cleansed by proper stockholder approval are those involving a controlling stockholder. I agree with Defendants' reading of *Corwin* for three reasons.

*First*, a plain reading of *Corwin* itself, along with its supporting authority and underlying context, undercuts Plaintiffs' interpretation. In its introductory passage, *Corwin* drew the precise distinction that Plaintiffs dismiss as immaterial:

> For sound policy reasons, Delaware corporate law has long been reluctant to second-guess the judgment of a disinterested stockholder majority that determines that a transaction *with a party other than a controlling stockholder* is in their best interests.[60]

---

[58] *Corwin*, 125 A.3d at 309.

[59] *Id.* at 312–13 ("Finally, when a transaction is not subject to the entire fairness standard, the long-standing policy of our law has been to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves.").

[60] *Id.* at 306 (emphasis supplied).

In the same paragraph, the Supreme Court expressly affirmed the Chancellor's

summary of his holding:[61]

> For the foregoing reasons, I conclude that, *even if the plaintiffs had pled facts from which it was reasonably inferable that a majority of . . . directors were not independent*, the business judgment standard of review still would apply to the merger because it was approved by a majority of the shares held by disinterested stockholders . . . in a vote that was fully informed.[62]

The remainder of *Corwin* is replete with citations to Delaware cases—many of

them relied upon by the Chancellor—that stand for the proposition that proper

stockholder approval restores business judgment rule review to transactions that

might otherwise be tainted by facts indicating that a majority of board members

breached their fiduciary duties, but not transactions involving a conflicted

controller, which remain subject to entire fairness review absent the robust suite of

procedural protections listed in *M&F Worldwide*.[63]  Indeed, our Supreme Court did

---

[61] *Id.* at 305 & n.1.

[62] *KKR Fin. Hldgs.*, 101 A.3d at 1003.

[63] An incomplete sampling of cases cited by the Supreme Court (appearing in footnotes 14 and 19 of *Corwin*) include: *PNB*, 2006 WL 2403999, at *14 ("[O]utside the *Lynch* context, proof that an informed, non-coerced majority of the disinterested stockholders approved an interested transaction has the effect of invoking business judgment rule protection for the transaction and, as a practical matter, insulating the transaction from revocation and its proponents from liability."); *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 890–91, 900–03 (Del. Ch. 1999) (holding that the business judgment rule applied to a transaction in which "a majority of [directors] could not disinterestedly or independently evaluate the merger" because fully informed, disinterested, uncoerced stockholders approved it); *Wheelabrator*, 663 A.2d at 1200 (holding that the effect of a

not purport to break new ground in this aspect of its *Corwin* decision; the court instead reasoned that "the overwhelming weight of our state's case law supports the Chancellor's decision below."[64]

In short, accepting Plaintiffs' interpretation would be tantamount to a conclusion that the *Corwin* court intended to contradict its own holding, the holding of the opinion it affirmed, and the holding in a number of the cases it cited. And that it did so without explanation. Ironically, *Corwin* itself observed that our Supreme Court will not tacitly reverse settled law.[65]

*Second,* Defendants' reading of *Corwin* and *Singh* comports with more recent guidance from this court. In *Volcano*, Vice Chancellor Montgomery-Reeves interpreted *Singh* as confirming that "upon a fully informed vote by a majority of a

---

fully informed vote of a majority of disinterested stockholders was to "extinguish plaintiffs' due care claim" and, as for plaintiffs' claim that the merger was an interested transaction, "invoke the business judgment standard, which limit[ed] review to issues of gift or waste"); *Solomon*, 747 A.2d at 1117, 1127 (holding that, in cases where plaintiffs allege directors breached their duty of loyalty absent the presence of a controller, a fully informed, non-coerced vote of disinterested shareholders would reinstate the business judgment rule as the applicable standard of review); *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 616–17 (Del. Ch. 1999) (holding that stockholder approval provided an independent and sufficient reason to apply the business judgment rule to a transaction challenged on grounds that directors breached their fiduciary duties of care and loyalty by failing to adequately inform themselves, acting in bad faith, and succumbing to conflicts of interest); *see also Corwin*, 125 A.3d at 311 n.24 (discussing the burden-shifting effect of majority-of-the-minority votes in controlling stockholder going-private merger contexts).

[64] *Corwin*, 125 A.3d at 311 n.20.

[65] *See id.* at 311 ("Had *Gantler* been intended to unsettle a long-standing body of case law, the decision would likely have said so.").

30

company's disinterested, uncoerced stockholders, the business judgment rule irrebuttably applies to a court's review of the approved transaction."[66] Thus, as confirmed by *Singh*, a stockholder challenge to a merger on the ground that the business judgment rule's presumptions have been rebutted with respect to a majority of directors will fall flat in the wake of proper stockholder approval of the transaction.[67]

*Third and finally*, dichotomous treatment of cases involving a controlling stockholder transaction and those involving rebuttal of the business judgment rule by virtue of board-level conflicts harmonizes *Corwin* with the policy rationales that animate Delaware controlling stockholder jurisprudence. As our courts have repeatedly held, in order for a stockholder vote to restore the court's confidence in an otherwise questionable transaction, the stockholders must not have been coerced into voting "yes." Coercion is deemed inherently present in controlling stockholder transactions of both the one-sided and two-sided variety,[68] but not in

---

[66] 2016 WL 3583704, at *11. *Singh* was issued after briefing on the motion concluded and *Volcano* was issued after the parties submitted the present motion for decision. Both cases, however, have been addressed by the parties in competing letter submissions.

[67] *Volcano*, 2016 WL 3583704, at *8 & n.16, *9–11.

[68] *See Pure Res.*, 808 A.2d at 436; *Wheelabrator*, 663 A.2d at 1204 ("The participation of the controlling interested stockholder is critical to the application of the entire fairness standard because, as [*Lynch*] and [*Stroud v. Grace*, 606 A.2d 75 (Del. 1992)] recognize, the potential for process manipulation by the controlling stockholder, and the concern that the controlling stockholder's continued presence might influence even a fully informed shareholder vote, justify the need for exacting judicial scrutiny and procedural

31

transactions where the concerns justifying some form of heightened scrutiny derive solely from board-level conflicts or lapses of due care.[69] Accordingly, under the current state of our law, stockholder approvals are afforded potency proportionate to their situational legitimacy—burden shifting in the controlling stockholder context,[70] and a restoration of business judgment deference in other contexts that would otherwise implicate entire fairness review.

---

protection afforded by the entire fairness form of review."); *Gen. Motors*, 734 A.2d at 617 ("'[I]mplied coercion' . . . has been found to exist where a controlling stockholder dominates the corporation."). I acknowledge that I have glossed over the significantly different degrees to which coercion inheres in transactions where the controller is on both sides of the transaction versus those conflicted transactions in which the controller stands on only one side. I will not dwell on this distinction for two reasons. First, the fact remains that disinterested stockholder approval achieves only burden-shifting in both contexts. Second, this case does not provide a factual vantage point from which to consider the issue because, for reasons that follow, the transaction at issue here does not involve a conflicted controller.

[69] *See supra* note 42 and accompanying text. This same reasoning applies to transactions that trigger enhanced scrutiny. Delaware courts apply enhanced scrutiny, a middle-ground situated between business judgment and entire fairness, in circumstances that present *a priori* reasons to question board members' motives that are comparatively less concerning than circumstances warranting the imposition of entire fairness. *See, e.g.*, *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 597 (Del. Ch. 2010) ("Avoiding a crude bifurcation of the world into two starkly divergent categories—business judgment rule review reflecting a policy of maximal deference to disinterested board decisionmaking and entire fairness review reflecting a policy of extreme skepticism toward self-dealing decisions—the Delaware Supreme Court's *Unocal* and *Revlon* decisions adopted a middle ground."). Classic *Unocal* and *Revlon* scenarios are said to subtly—and categorically—risk corrupting the decisions of even disinterested directors. *See, e.g.*, *id.* Because enhanced scrutiny scenarios present only board-level conflicts, stockholders remain equipped to cleanse the challenged transaction by voicing their fully informed, uncoerced approval.

[70] *See supra* notes 54 & 56 and accompanying text; *see also* J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wm. Mitchell L. Rev. 1443, 1461

For all of these reasons, I reject Plaintiffs' attempt to expand *Corwin* beyond its clearly intended meaning by seizing upon a single passage that superficially supports their position. Instead, I agree with Defendants' more discriminating interpretation, consistent with *Singh* and *Volcano*, that under *Corwin* and the expansive supporting authority it cites, the business judgment rule irrebuttably applies if a majority of disinterested, uncoerced stockholders approve a transaction *absent a looming conflicted controller*.

## 2. There was no conflicted controller.

Plaintiffs contend that the challenged merger was a one-sided controller transaction because: (1) some combination of five stockholders—Thomas, McNerney, Panorama, and the Auspex directors with positions at those two firms (Zisson, Shah, and Ferguson)—are, collectively, a control block;[71] *and* (2) the controller, in whatever form it may take, competed with the other Auspex stockholders for portions of the consideration Teva was willing to pay. Neither premise has been well-pled in the Complaint.

---

(2014) ("Because the controller's influence operates at both the board and stockholder levels, neither a special committee nor a majority-of-the-minority vote, standing alone, is sufficient to sterilize the controller's influence and reestablish the presence of a qualified decision maker.").

[71] Plaintiffs offer two alternative configurations of these stockholders as the potential control group/controlling stockholder. First, they argue that Thomas, McNerney, Panorama, and the VC Directors formed a control block. Alternatively, they argue that Thomas, McNerney was a controlling stockholder alone.

### a. There was no controlling stockholder.

Under Delaware law, a stockholder owning less than half of a company's outstanding shares may nonetheless be deemed a controller where "the stockholder can exercise actual control over the corporation's board."[72] This "actual control" test requires the court to undertake an analysis of whether, despite owning a minority of shares, the alleged controller wields "such formidable voting and managerial power that, as a practical matter, [it is] no differently situated than if [it] had majority voting control."[73] Making this showing is no easy task, as the minority blockholder's power must be so potent that it triggers the traditional *Lynch* concern that independent directors' free exercise of judgment has been compromised.[74] A controlling stockholder can exist as a sole actor or a control

---

[72] *KKR Fin. Hldgs.*, 101 A.3d at 995; *see also Crimson*, 2014 WL 5449419, at *12 ("[A] large blockholder will not be considered a controlling stockholder unless they actually control the board's decisions about the challenged transaction.").

[73] *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (quoting *PNB*, 2006 WL 2403999, at *9).

[74] *PNB*, 2006 WL 2403999, at *9 ("[The actual control test] is not an easy one to satisfy and stockholders with very potent clout have been deemed, in thoughtful decisions, to fall short of the mark."); *Morton's*, 74 A.3d at 665 ("[T]he minority blockholder's power must be 'so potent that independent directors . . . cannot freely exercise their judgment, fearing retribution' from the controlling minority blockholder." (quoting *PNB*, 2006 WL 2403999, at *9)); *see also KKR Fin. Hldgs.*, 101 A.3d at 994 (finding that a minority blockholder was not a controlling stockholder where there were "no well-pled facts from which it is reasonable to infer that [the alleged controller] could prevent [the board] from freely exercising its independent judgment in considering the proposed merger or, put differently, that [the alleged controller] had the power to exact retribution by removing the [directors] from their offices if they did not bend to [the alleged controller's] will in their consideration of the proposed merger").

block of "shareholders, each of whom individually cannot exert control over the corporation . . . [but who] are connected in some legally significant way—e.g., by contract, common ownership agreement, or other arrangement—to work together toward a shared goal."[75]

More than once this court has invoked the facts of *In re Cysive, Inc. Shareholders Litigation*[76] as a benchmark for the minimum degree of managerial clout needed to meet the actual control test where the alleged controller's holdings are well below 50% of a company's outstanding shares.[77] There, the alleged controller, Nelson Carbonell, was the company's founder, Chairman and CEO, and owned 35% of the company's outstanding stock with an option to buy more.[78] Notwithstanding his less-than-majority stake, the court found that Carbonell wielded *Lynch*-like coercive influence over two close family members whom he hired as executives,[79] as well as another director, such that he actually controlled

---

[75] *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009).

[76] 836 A.2d 531 (Del. Ch. 2003).

[77] *Morton's*, 74 A.3d at 665 ("In *In re Cysive*, this court made, perhaps, its most aggressive finding that a minority blockholder was a controlling stockholder."); *KKR Fin. Hldgs.*, 101 A.3d at 991 (quoting *Morton's* for the same proposition); *cf. Crimson*, 2014 WL 5449419, at *11 (using *Cysive*'s facts to illustrate the sort of "extreme showing" needed to earn the title of controller); *PNB*, 2006 WL 2403999, at *10 (same).

[78] *Cysive*, 836 A.2d at 533–35.

[79] *Id.* at 552 ("Given this voting power, the threat of 'inherent coercion' that Carbonell presents to the independent directors and public stockholders of Cysive cannot be rationally distinguished from that found to exist in *Lynch,* or cases of its kind. If

roughly 40% of the company's stock.[80]  The court ultimately held that Carbonell was a controlling stockholder despite his minority holdings because his "day-to-day managerial supremacy" and large *de facto* ownership stake gave him the practical ability to control the corporate decision making process—a fact that "rational independent directors, public stockholders, and other market participants" would have perceived.[81]

No possible permutation of the VC Stockholders and VC Directors amounts to a controlling stockholder in this case because no well-pled allegations permit even a reasonable inference that any such controller or control block could "exercise actual control over [Auspex's] board."[82]  Allegations to that effect in the Complaint are slim to nonexistent.  The VC Stockholders' combined holdings sum up to 23.1% of Auspex's outstanding shares, a small block in controller contexts,[83] and no facts suggest that Thomas, McNerney, Panorama, or any VC Director compromised or otherwise influenced other directors' free exercise of judgment. This is unsurprising given that the Complaint, which does not once mention the

Carbonell becomes dissatisfied with the independent directors, his voting power positions him well to elect a new slate more to his liking without having to attract much, if any, support from public stockholders." (footnote omitted)).

[80] *Id.* at 535.

[81] *Id.* at 552–53.

[82] *KKR Fin. Hldgs.*, 101 A.3d at 995.

[83] *See Crimson*, 2014 WL 5449419, at *10 n.50 (collecting cases).

word "controller" or any derivation of that concept, focuses instead on attempting to plead facts that would rebut the business judgment rule's presumptions for a majority of directors by illustrating that they were oblivious to the shopping process that Shah unilaterally ran[84] and labored under disabling conflicts of interest. These allegations, more evocative of interestedness, bad faith dereliction of duty, or lack of due care,[85] do not, as the actual control inquiry requires, substantiate the notion that any VC Stockholder-based control group had practical and perceived authority to "control the corporation, [if] it so wish[ed]."[86]

Plaintiffs' reliance upon N*ew Jersey Carpenters Pension Fund v. infoGROUP*[87] and *Calesa Associates, L.P. v. American Capital, Ltd.*[88] as support for their controlling stockholder argument is misplaced. In *infoGROUP*, entire

---

[84] The Complaint contains over a dozen allegations that actions taken during the negotiation process occurred "without Board oversight," or words to that effect. Compl. at 34; *id.* ¶¶ 79–83, 86–89, 93, 103–04. The notion that Shah kept the board in the dark is at odds with the idea that Shah, as an arm of Thomas, McNerney, was a controller. Were Shah a controller with the same *de facto* authority and coercive influence as a majority stockholder, he would have power over corporate decision making by controlling or dominating the Board. The fact that he hid things from the Board suggests precisely the opposite—that the only way he could get his way was by strategic misdirection.

[85] Nothing in this opinion is intended as a holding that Plaintiffs have adequately pled that any of the directors were, in fact, interested, acted in bad faith, or acted with gross negligence.

[86] *Morton's*, 74 A.3d at 666 (quoting *Cysive*, 836 A.2d at 553).

[87] 2011 WL 4825888 (Del. Ch. Sept. 30, 2011).

[88] 2016 WL 770251 (Del. Ch. Feb. 29, 2016).

fairness applied under relatively extreme allegations that a director drove fellow board members to accept a sale of the company through intimidation tactics that included blackmail and threats to sue.[89] And in *Calesa*, the court found that plaintiffs stated a claim that a controlling stockholder existed because "a majority of the board was not disinterested or lacked independence from" the alleged controller.[90]

Here, by contrast, there are no allegations of either overt or even subtle bullying or that a majority of Auspex's directors were aligned with Thomas, McNerney and Panorama. Assuming *arguendo* that the three VC Directors were controlled, Plaintiffs fail adequately to plead that at least two of the remaining six directors owed any allegiance to the VC Stockholders. The connections alleged— that a four-member committee comprised of two VC Directors recommended (but

---

[89] *infoGROUP*, 2011 WL 4825888, at *11. The court in *In re Crimson Exploration Inc. S'holder Litig.* noted that "it is unclear if the [*infoGROUP*] court determined whether [defendant-director] was a controlling stockholder." 2014 WL 5449419, at *11 n.60 (Del. Ch. Oct. 24, 2014). This apparent confusion seems to arise from the fact that the *infoGROUP* court, in holding that plaintiffs' complaint supported a reasonably conceivable inference that entire fairness would apply, concluded both that one forceful director, Gupta, "dominated [a majority of other directors] through a pattern of threats" and that "a majority of the Board was interested or lacked independence." *infoGROUP*, 2011 WL 4825888, at *11. A distinction between those two conclusions, to the extent one exists, might have important implications in the context of *Corwin* cleansing. Nonetheless, I need not address that issue in this case because *infoGROUP* is distinguishable on its facts.

[90] *Calesa*, 2016 WL 770251, at *12.

did not grant) Tax Reimbursements to Saks and Sarshar[91] and that Bleil and Greer (the directors added to the Board when it expanded from seven to nine) "were handpicked by conflicted directors" and given generous stock options[92]—are too tenuous to evidence domination and control as a matter of law, particularly given the complete absence of allegations that these connections aligned each director not only with the VC Directors, but also with the firms they worked for.

### b. There was no conflict.

Plaintiffs' failure adequately to allege the presence of a controlling stockholder is an independent and sufficient reason to dispense with Plaintiffs' related attempt to invoke entire fairness review. Even if Plaintiffs had properly alleged the presence of a controller, though, Plaintiffs would remain unable to invoke entire fairness on a controlling stockholder theory since they also failed to plead that trigger's second factual requisite: that the controller engaged in a conflicted transaction.[93]

Plaintiffs argue in substance that the venture capital firms' desire quickly to monetize their position in Auspex led them to conduct, through Shah, a rushed, stilted sales process that failed to maximize Auspex's value. Thus, according to

---

[91] Compl. ¶ 116.

[92] *Id.* ¶ 72.

[93] *See Crimson*, 2014 WL 5449419, at *9 ("[T]riggering entire fairness review requires the controller or control group to engage in a conflicted transaction.").

Plaintiffs, although it appears on the surface that the VC Stockholders' interests were perfectly aligned with those of minority stockholders—after all, they agreed to receive the same consideration for their stock in an arm's length third party transaction—Plaintiffs have pled that the venture capital firms in fact used their power over Auspex to extract for themselves comparatively more value from the transaction in a way that hurt the minority. Again, I disagree.

This court has, in the past, evaluated liquidity theories of this sort with marked skepticism, characterizing them as "unusual," "counterintuitive," and "aggressive."[94] These characterizations are often well-justified. By asserting this theory, Plaintiffs ask the Court to make an extraordinary inference: that rational economic actors have chosen to short-change themselves.[95] With this internal conflict in mind, this court has been reluctant to find a liquidity-based conflict absent the presence of additional circumstantial indicators of conflict that elevate this fundamentally implausible idea to the level of reasonably conceivable:[96]

---

[94] *Synthes*, 50 A.3d at 1034–35.

[95] *Morton's*, 74 A.3d at 666–67 ("[T]he presumption is that a large blockholder, who decides to take the same price as everyone else, believes that the sale is attractive, and thus is a strong indication of fairness and that judicial deference is due. In most situations, the controlling stockholder has interests identical to other stockholders: to maximize the value of its shares." (footnotes omitted)).

[96] The *Synthes* court also justified its skepticism of liquidity-based conflict theories by calling out the risk that a contrary rule would create perverse incentives. Chief Justice Strine, then writing as Chancellor, observed that controlling stockholders ought to be encouraged, where possible, to seek pro rata premia because controllers often have the

It may be that there are very narrow circumstances in which a controlling stockholder's immediate need for liquidity could constitute a disabling conflict of interest irrespective of pro rata treatment. Those circumstances would have to involve a crisis, fire sale where the controller, in order to satisfy an exigent need (such as a margin call or default in a larger investment) agreed to a sale of the corporation without any effort to make logical buyers aware of the chance to sell, give them a chance to do due diligence, and to raise the financing necessary to make a bid that would reflect the genuine fair market value of the corporation.[97]

For instance, in *infoGROUP*, a viable disabling liquidity need was found in the presence of well-pled allegations that the interested stockholder owed $12 million in settlement payments and $13 million in loans, had no sources of cash inflow, had recently paid out $4.4 million, and planned to start a new expensive business venture.[98] Similarly specific allegations justified a finding of a unique liquidity need in *In re Answers Corp. Shareholder Litigation*.[99] There, the complaint described why the allegedly interested entity (Redpoint) had a liquidity need that was unique, why a cash sale was necessary for monetization, why an

---

most skin in the game and therefore the strongest incentive to maximize the sale price. Thus, "[a]s a general matter . . . if one wishes to protect minority stockholders, there is a good deal of utility to making sure that when controlling stockholders afford the minority pro rata treatment, they know that they have docked within the safe harbor created by the business judgment rule." Otherwise, the court reasoned, controllers "might as well seek to obtain a differential premium for themselves or just to sell their control bloc, and leave the minority stuck-in." *Synthes*, 50 A.3d at 1035–36.

[97] *Id.* at 1036.

[98] *infoGROUP*, 2011 WL 482588, at *9.

[99] 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012).

immediate sale was necessary, and that Redpoint in fact sought a fast sale.[100] In particular, plaintiffs alleged that although smaller blockholders could sell their shares in the open market, Redpoint's 30% position in Answers Corp. was illiquid because the company's stock was thinly traded.[101] It was further alleged that Redpoint sought a cash sale because that was its only viable liquidity option, a preference it made known by threatening to fire Answers Corp.'s entire management team unless a sale was completed in short order.[102] Finally, Redpoint's board designees, aware of internal projections showing that Answers Corp.'s value was rising, sought to secure a fast sale before having to disclose improved projections.[103]

Unlike the complaints in *infoGROUP* and *Answers*, the Complaint is devoid of non-conclusory allegations that would support a reasonable inference that the VC Stockholders faced a unique liquidity need, a specific need for cash or an exigency that would prompt them to seek a fire sale. The Auspex public disclosures describe a robust shopping period that ultimately secured stockholders

---

[100] *Id.* at *1–2, *7.

[101] *Id.* at *1, *7 n.46.

[102] *Id.* at *1–2.

[103] *Id.* at *2–3, *7 n.46. In particular, the complaint alleged that Answers Corp.'s financial advisor "told the Board that 'time is not a friend to this deal with continued out performance and a looming q4 earnings call,' and that, in response, the Board sped up the sales process." *Id.* at *3.

the highest available offer for their Auspex stock. And far from pleading a unique liquidity problem, the Complaint simply asserts, without any specific factual support, that the VC Stockholders' holdings were "illiquid."[104] Even if I deemed that allegation nonconclusory,[105] the Complaint offers no facts from which to infer that this predicament was unique to the VC Stockholders such that they were incented to seek a sale on terms the other Auspex stockholders did not want. By contrast, in *Answers*, the plaintiffs alleged that Answers Corp.'s thinly-traded stock could be sold by small blockholders, but not Redpoint.[106] Here, Plaintiffs ask that I infer that same state of disparate liquidity despite no well-pled allegations to that effect. Thus, I could just as easily infer that Auspex stock was categorically illiquid and the Board discharged its fiduciary duties by securing a merger that satisfied liquidity needs shared by all.

Nor have Plaintiffs adequately pled the existence of a cash need. Unlike *infoGROUP*, the Complaint makes no allegation that Thomas, McNerney and Panorama needed fast cash to pay debts or fund new business ventures or

---

[104] Compl. ¶¶ 2, 50, 121.

[105] Allegations in the Complaint make it difficult to give the Plaintiffs the benefit of this supposition. For instance, the Complaint describes instances in which the market reacted quickly and, at times, drastically to various indices of Auspex's growth prospects. Compl. ¶¶ 40, 42. The logical inference to be drawn from these allegations, if any, is that a *bona fide* market existed for Auspex stock.

[106] *Answers*, 2012 WL 1253072, at *1, *7 n.46.

investments.[107]  Instead, Plaintiffs rely on sweeping characterizations of the venture capital industry writ large to support their conclusory allegations of conflict.  In particular, the Complaint alleges that venture funds typically nurture investments in portfolio companies for 1-10 years before entering a "harvesting period" during which funds urgently seek cash deals allowing them to pay investors or start new funds.[108]  Even if the Complaint contained particular allegations ascribing these generalized needs to Thomas, McNerney and Panorama, which it does not, the allegations would not support a conclusion that the VC Stockholders drove the Auspex board to approve a conflicted transaction.

This court rejected a very similar argument resting on stronger facts in *In re Morton's Restaurant Group, Inc. Shareholders Litigation*.[109]  There, plaintiffs alleged, *inter alia*, that a private equity fund had an urgent need to monetize its position in Morton's in order to raise a new fund and free up investors to participate in that new fund.[110]  The court declined to hold that this liquidity theory raised even a pleadings-stage inference that the private equity fund was conflicted, reasoning that the relatively common desire to raise a new fund was "not some

---

[107] *infoGROUP*, 2011 WL 482588, at *9.

[108] Compl. ¶¶ 53–55.

[109] 74 A.3d at 667–69.

[110] *Id.* at 667.

unusual crisis, requiring a fire sale," that an immediate sale addressed no identifiable liquidity concern of the fund given that proceeds of the liquidation would likely flow to the fund's investors, and that private equity funds are naturally disincentivized hastily to seek below-market merger consideration to avoid alienating past investors.[111]

Each conceptual difficulty identified in *Morton's* applies, in some form, here. Plaintiffs allege generally that venture capital firms cyclically raise and liquidate funds on a predicable schedule that would strongly suggest that monetization is hardly an "unusual crisis" in the venture capital space. Plaintiffs also fail to clarify to what extent, if at all, Thomas, McNerney and Panorama would absorb the merger proceeds they are alleged to so desperately need. Further, venture capital funds, like private equity funds, are naturally incentivized to pursue maximally profitable deals for their investors. Such deals may, in some circumstances, take the form of a payout consisting of both cash and stock in a company like Auspex that, according to Plaintiffs, had strong upside that materialized immediately after the merger with the arrival of the June Test Results.[112] In short, Plaintiffs offer no logical reason why the VC Stockholders' need for cash was so great that they would be willing to leave meaningful value on

---

[111] *Id.* at 668.

[112] Compl. ¶ 14; *id.* ¶¶ 38–43 (describing Auspex's "strong growth prospects").

45

the table.   Thus, I conclude that the Complaint fails to sustain a reasonably conceivable inference that the VC Stockholders subordinated minority interests to their own by masterminding a hurried, inadequate sale process to extract a unique benefit.

Moreover, Plaintiffs failed to allege that any existing need for cash on the part of the VC Stockholders was exigent.  Plaintiffs' sole exigency theory is a mirror image of the exigency theory asserted in *Answers*—that the venture capital firms and their board designees "rush[ed] to conclude the process by the end of the first quarter, before the announcement of significant new positive results on SD-809" in June 2015 that would scuttle the proposals of existing bidders, including Teva.[113]   The problem with that theory is, unlike in *Answers*, the Complaint contains no well-pled allegations either that the supposedly conflicted fiduciaries knew the forthcoming public announcements would be positive or even that the conflicted controller was the one who set the operative deadlines.

The Complaint alleges that Shah informed potential bidders of the *Board's* preference, not *his* preference, to conclude the process by the end of the first quarter of 2015.[114]   These allegations are consistent with the Recommendation Statement's description of the October 30, 2014 meeting at which the Board

---

[113] Answering Br. 29.

[114] Compl. ¶¶ 76, 91.

instructed Auspex's senior management team to "get clarity on possible strategic interest by the first quarter of 2015" in order to avoid a distracting, protracted sales process that might detract from Auspex's other operations.[115]

The more fundamental problem with Plaintiffs' exigency theory, however, is that no well-pled facts allow an inference that the alleged controller had reason to think the June Test Results would cause Auspex's stock price to spike. Because Auspex publicly reported that SD-809 had a 90% chance of success for its Huntington's chorea indication, the market (including Teva) presumably had already priced in the alleged controller's optimism with respect to the efficacy of the drug for that treatment.[116] As for SD-809's tardive dyskinesia and Tourette's syndrome indications, no allegations support a reasonable inference that the VC Stockholders' internal assessment of success probabilities differed from those reported in the Recommendation Statement—which were 50% and 30%, respectively.[117] Thus, unlike the alleged conflicted fiduciaries in *Answers*, who had their hands on encouraging internal projections that would hit the market

---

[115] Recommendation Statement 18.

[116] See *id*. 29.

[117] *Id.*

shortly, the VC Stockholders had no similar non-public knowledge of an imminent accretive disclosure requiring a preemptive fire sale.[118]

Finally, Plaintiffs' characterization of the sales process as rushed and tilted towards Teva conflicts with their own allegations. The Complaint alleges that Auspex and its representatives planned to undertake a three-month sales process beginning in December 2014 and adhered to that schedule by agreeing to merge with Teva in late-March.[119] During the intervening three months, Auspex and its representatives held talks with 22 companies, affirmatively solicited interest from 9, entered into confidentiality agreements with 6, and ultimately chose the bid that outpriced all others by $500 million. A bird's-eye view of the sales process does not suggest the VC Stockholders or VC Directors were conducting an unfair fire sale.

A closer look at the process is no more revealing of a conflict. Plaintiffs' ground for asserting that the process evidences a conflicted transaction is that Shah

---

[118] At Oral Argument, counsel for Plaintiffs conceded that the Board had no internal information suggesting the June Trial Results would be positive, but that this Court can draw the inference that Shah did. Tr. 42–43. Plaintiffs' theory on how Shah came upon this knowledge is not entirely clear, but seems to be based on the premise that the December 2014 Phase 3 results contained embedded hints as to how the June trials would unfold, and that Shah alone knew of those hints and either hid them from the Board or did not share them with the Board. *Id.* I will not dwell on the sufficiency of this theory because it is without any well-pled factual support.

[119] Compl. ¶ 76 (indicating that as of December 18, 2014, Shah understood the Board's deadline to be the end of the first quarter in 2015).

snubbed bidders other than Teva, whose bid was all cash.  Plaintiffs support this general claim with two allegations: that Shah gave Teva a time extension it was unwilling to give to Company C and that Shah ignored a Board instruction to solicit a renewed bid from Company D.  These theories miss the mark because neither reflects an urgent desire for fast cash.

Although it is reasonably conceivable that Shah "was unwilling to accommodate a [time extension] request from Company C,"[120] this decision does not betray a desire for fast cash because Company C could have, in theory, come back with a cash offer.  It is illogical to infer that a controller seeking fast cash would deny itself the chance to consider an inbound topping bid that might be all cash.  Instead, the logical inference from well-pled facts is that Company C, who had not yet submitted a bid as of its late-stage expression that it needed more time, was unable to submit a bid within the Board's deadline because it could not even conclude due diligence "within the timeframe demanded by Auspex," much less finalize a deal.[121]  Teva, by contrast, was given an extension on the condition that a merger agreement would be executed by the end of March.

Plaintiffs' suggestion that Shah ignored the Board's instruction to follow-up with Company D is also not well-pled.  Indeed, the Complaint nowhere expressly

---

[120] *Id.* ¶ 112.

[121] *Id.*

makes this allegation. Instead, Plaintiffs allege that "it remains unclear if Shah ever followed the Board's instruction" and notes that the Recommendation Statement is silent on whether he did.[122] Thus, I am asked to infer that Shah in fact ignored the Board's instruction based on the fact that he wanted to avoid giving Company D a chance to submit a topping bid that might have a stock component. For reasons already discussed, however, I am satisfied that the Complaint's other well-pled facts (that is, allegations aside from the alleged snubbing of Company D) fail to support a logical inference that Shah desperately sought a cash deal. When the supposed motivation for Shah's rush to close the Teva deal is stripped away as a backdrop, the suggestion that Shah ignored the Board's instruction with respect to Company D is not reasonably conceivable.

Plaintiffs have argued that the alleged controllers' natural profit motive was temporarily overpowered by their desire for a "unique benefit"—immediate liquidity—not shared by other stockholders. For reasons discussed above, Plaintiffs have failed to substantiate that theory with well-pled facts. [123]

---

[122] *Id.* ¶ 114.

[123] To be sure, there are cases in which venture capital harvesting can give rise to disabling transactional conflicts. For example, in *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *2 & n.2, *7 (Del. Ch. July 24, 2009) this court concluded that a liquidity desire created a disabling conflict at the motion to dismiss stage given well-pled allegations of both disparate consideration and email communications evidencing an intent to sell quickly. The *Trados* plaintiffs, however, did more than make conclusory allegations about the life cycle of venture capital funds. They pled facts supporting a reasonable inference that the particular venture capital firm at issue, along with its board

Accordingly, I conclude that the alleged controllers in this case were not conflicted as a matter of law.

Given the absence of a looming conflicted controller, the business judgment rule irrebuttably applies to the challenged merger so long as the transaction received proper stockholder approval. I turn next to whether that requisite approval occurred.

### 3. The merger was approved by fully informed, disinterested, and uncoerced stockholders

Stockholders owning roughly 78% of Auspex's outstanding stock expressed their view that the merger with Teva was a good deal. By tendering, they all agreed to convert their shares into the right to receive $101 per share and let Auspex become Teva's wholly-owned subsidiary. Among that "yes"-block were stockholders owning 27.4% of Auspex's shares who contractually agreed to tender under the Tender and Support Agreement. Excluding them, stockholders owning roughly 70% of the outstanding shares not contractually bound to tender agreed to the merger.

Not all stockholder approvals of a transaction have a cleansing effect. Rather, "the [*Corwin*] doctrine applies only to fully informed, uncoerced stockholder votes, and if troubling facts regarding director behavior were not

designees, had a short-term motivation to harvest at the expense of other stockholders. No similar allegations appear in Plaintiffs' Complaint.

51

disclosed that would have been material to a voting stockholder, then the business judgment rule is not invoked." [124]  Further, only disinterested stockholder expressions of approval are considered.[125]

Plaintiffs have not expressly argued that the disinterested stockholders' decision to tender was coerced.  To the extent their eleventh-hour controlling stockholder argument was intended to suggest a coerced tender, that argument has been rejected.  And although Plaintiffs' Complaint challenges the Recommendation Statement as containing materially misleading disclosures, Plaintiffs have withdrawn those claims in the course of briefing this motion.[126] This amounts to a concession, at least by these Plaintiffs, that the tender of shares was fully informed.[127]

---

[124] *Corwin*, 125 A.3d at 312.

[125] *See id.* at 311–13.

[126] Answering Br. 3 n.6.  Plaintiffs did not argue that stockholders were not fully informed in their Answering Brief, but did during Oral Argument.  *See* Tr. 45–46. Because it was not briefed, I consider this argument waived and do not address it here. *Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

[127] *See Harbor Finance*, 751 A.2d at 890 (holding that the fate of a claim alleging breaches of the duty of loyalty depended upon the sufficiency of a disclosure claim "because the effect of untainted stockholder approval of the Merger is to invoke the protection of the business judgment rule and to insulate the Merger from all attacks other than on grounds of waste"); *Wheelabrator*, 663 A.2d at 1200 ("In rejecting the disclosure claim, the Court necessarily has determined that the merger was approved by a fully informed vote of a majority of WTI's disinterested stockholders."); *Gen. Motors*, 734 A.2d at 615 ("To a large extent, the disposition of this motion . . . turns on whether plaintiffs have stated a claim that the GMH stockholder approval of the Hughes

Plaintiffs' sole challenge to the sufficiency of the Auspex stockholders' 78% tender is that a first-step tender offer completed according to Section 251(h) does not qualify as a "stockholder *vote*"[128] under *Corwin*. This precise argument was considered and rejected by Vice Chancellor Montgomery-Reeves in her recent *Volcano* opinion.[129] I agree with *Volcano*'s well-reasoned holding and apply it now to dispense with Plaintiffs' last attempt to avoid business judgment review.

## B. Plaintiffs Have Not Stated a Claim for Waste

Having determined that Plaintiffs have not adequately pled that the transaction involved a controlling stockholder, and that a proper stockholder approval of the transaction would cleanse any well-pled allegations that the transaction was the product of board-level conflicts that might trigger entire fairness review, the only claim that Plaintiffs could state that would overcome the otherwise irrebuttable application of the business judgment rule is a claim for

---

Transactions was tainted by either improper coercion or false and misleading disclosures. If not, then all three counts of plaintiffs' complaint are susceptible to dismissal.").

[128] *Corwin*, 125 A.3d at 312 (emphasis supplied).

[129] 2016 WL 3583704, at *14 ("I conclude that the acceptance of a first-step tender offer by fully informed, disinterested, uncoerced stockholders representing a majority of a corporation's outstanding shares in a two-step merger under Section 251(h) has the same cleansing effect under *Corwin* as a vote in favor of a merger by a fully informed, disinterested, uncoerced stockholder majority.").

waste.[130]  They have not even attempted to make such a claim.  Consequently, the Complaint must be dismissed in its entirety.[131]

### C. Plaintiffs May Not Amend Their Complaint Under Rule 15(aaa)

Plaintiffs' Answering Brief concludes with the following request: "[I]n the event the Court grants Defendants' motion, Plaintiffs respectfully request leave to amend their Complaint, which may be granted even after the filing of Plaintiffs' opposition brief."[132]   This request finds no support in Court of Chancery Rule 15(aaa), which provides:

> Notwithstanding subsection (a) of this Rule, a party that wishes to respond to a motion to dismiss under Rules 12(b)(6) or 23.1 by amending its pleading must file an amended complaint, or a motion to amend in conformity with this Rule, no later than the time such party's answering brief in response to either of the foregoing motions is due to be filed. **In the event a party fails to timely file an amended complaint or motion to amend under this subsection (aaa) and the Court thereafter concludes that the complaint should be dismissed under Rule 12(b)(6) or 23.1, such dismissal shall be with prejudice** (and in the case of complaints brought pursuant to Rules 23 or 23.1 with prejudice to the named plaintiffs only) **unless the Court, for good cause shown, shall find that dismissal with prejudice would not be just under all the circumstances**.[133]

---

[130] *Volcano*, 2016 WL 3583704, at *17 (quoting *Cede*, 634 A.2d at 361).

[131] *See Singh*, 137 A.3d at 151–52 ("When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result.").

[132] Answering Br. 40.

[133] Ct. Ch. R. 15(aaa) (emphasis supplied).

Plaintiffs' conditional request to amend is not a procedurally proper motion to amend. More importantly, Plaintiffs have not shown, or even attempted to show, good cause as to why dismissal with prejudice would be unjust. Accordingly, their request to amend is denied, and dismissal shall be with prejudice.

## IV. CONCLUSION

For the foregoing reasons, the Complaint fails to state a claim upon which relief can be granted under Court of Chancery Rule 12(b)(6). Defendants' motion to dismiss is GRANTED with prejudice.

**IT IS SO ORDERED.**

*/s/ Joseph R. Slights III*

Vice Chancellor